## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

       v.

KAABA MAJEED,
YUNUS RASSOUL, a.k.a. Yunus Rassoull,
JAMES STATON, a.k.a. Adam Winthrop,
RANDOLPH RODNEY HADLEY,
DANIEL AUBREY JENKINS,
DANA PEACH,

       Defendant.

Case No. 21-20060-JAR

## <u>JURY INSTRUCTIONS</u>

INSTRUCTION NO. 1

Members of the Jury:

Now that you have heard all of the evidence, it becomes my duty to instruct you on the law applicable to this case.  In the interest of clarity, I will read the instructions to you, and each of you will have a copy of the instructions in the jury room.

In any jury trial there are, in effect, two judges.  I am one of the judges; the other is the jury.  It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration.  It is your duty, as judges of the facts, to follow and apply that law to the facts as you find them from the evidence in the case.  You are not to single out one instruction alone as stating the law, but you must consider the instructions as a whole.  Neither are you to be concerned with the wisdom of any rule of law stated by me.  That is, you must not substitute or follow your own notion or opinion as to what the law is or ought to be.  It is your duty to apply the law as I give it to you, regardless of the consequences.

INSTRUCTION NO. 2

An indictment is but a formal method of accusing a defendant of a crime.  It is not evidence of any kind against a defendant, and does not create any presumption or permit any inference of guilt.  It is a mere charge or accusation—nothing more and nothing less.

INSTRUCTION NO. 3

The Indictment in this case charges substantially as follows:

<u>Introduction</u>

At all times material to the indictment:

1.    United Nation of Islam (UNOI) was an organization that was founded by Royall Jenkins ("Jenkins").  Contrary to the teachings of the Islamic faith, Jenkins represented that he, himself, was Allah, or God.  Jenkins claimed that in approximately  1978, he was abducted by angels who transported him through the galaxy in a spaceship and instructed him how to rule on Earth.

2.    Jenkins began gathering members in Maryland but later moved the UNOI headquarters in the late 1990s to Kansas City, Kansas, where the organization continued to grow in membership.  UNOI eventually grew to include hundreds of members.

3.    United Nation of Islam, Inc. was incorporated in 1999 in the State of Louisiana with Jenkins as its President and defendant **JAMES STATON,** a.k.a. Adam Winthrop **("STATON"),** as its Secretary.

4.    Over the years since its inception, UNOI has also been known as The Value Creators and The Promise Keepers.

5.    Jenkins led UNOI until approximately 2012.  His responsibility was to oversee all activities of UNOI and approve all decisions after consultation with his wives and officials, who assisted him in managing UNOI operations.

6.    Jenkins created, drove, and asserted UNOI principles, which included rules that members had to follow, required "duty" or unpaid labor, and emphasized the eternal consequences of noncompliance.

7.     UNOI operated locations or "temples" in various cities around the United States, including but not limited to Kansas City, Kansas; New York, New York; Cincinnati, Ohio; Atlanta, Georgia; Raleigh, North Carolina; and Newark, New Jersey. The term "temple" did not denote any specific building, physical structure, or house of worship, but rather referenced a geographic area where UNOI operated businesses or where a significant number of members resided.

8.     UNOI had a national and local organizational structure. Nationally, there was a Secretary, Lieutenant, and Minister, as well as other specialized positions, such as a leader who oversaw the youth or men. Local leadership of each individual "temple" generally mirrored the national leadership structure, such that each individual "temple" had a local Secretary, Lieutenant, and Minister, as well as a position referred to as Captain. Jenkins appointed these officials.

9.     Jenkins was the overall leader, referred to within the organization as "Allah," or "Father." **STATON** helped grow the organization along with Jenkins and became National Secretary. Defendants **KAABA MAJEED ("MAJEED"), YUNUS RASSOUL ("RASSOUL"), RANDOLPH RODNEY HADLEY ("HADLEY"),** and **DANIEL AUBREY JENKINS ("AUBREY")** also quickly rose to official status within UNOI. **MAJEED** became National Lieutenant; **RASSOUL** became National Minister; **HADLEY** became a Captain; and **AUBREY** oversaw the male membership. Defendants **ETENIA KINARD ("KINARD"), DANA PEACH ("PEACH"),** and **JACELYN GREENWELL ("GREENWELL")** were three of Jenkins's many wives. **KINARD** and **GREENWELL** oversaw the youth membership. All of the defendants assisted Jenkins in managing the organization.

10.     UNOI opened and operated at least ten businesses around the United States that were staffed entirely by unpaid UNOI members. These businesses were primarily restaurants and bakeries, but also included other businesses such as a gas station and clothing store. UNOI required members to staff these businesses as part of their "duty," and did not pay these members, many of whom were minor children or young adults. UNOI operated businesses in Kansas City, Kansas; Newark, New Jersey; New York, New York; Wichita, Kansas; Cincinnati, Ohio; Dayton, Ohio; Temple Hills, Maryland; Baltimore, Maryland; Atlanta, Georgia; New Haven, Connecticut; Hamden, Connecticut; Durham, North Carolina; Mobile, Alabama; and elsewhere.

11.     UNOI recruited hundreds of full-time and part-time members. Full-time members lived in housing provided by UNOI and worked without pay at UNOI businesses. Part-time members lived and worked outside of UNOI but donated financially to UNOI. UNOI employed without pay many children who joined with their parents or were born to parents who were already members of the organization.

12.     UNOI encouraged many adult members to send their children to Kansas City, Kansas for the purpose of attending a UNOI-run school and working in UNOI-operated businesses. UNOI enticed parents to send their children by promising a fulsome education and the development of life skills through working in UNOI-operated businesses. UNOI did not inform the parents that their children would work extended hours, sometimes in lieu of attending school, or be sent to other UNOI businesses around the country to work extended hours and receive no legitimate education.

13.     UNOI "dispatched" and transported the children of adult members around the country to work at UNOI businesses. "Dispatching" was the practice of deciding that youth

members would move to and work in a specific location without pay, and then

transporting those youth members to that location, typically without their parents or other

adult family members.  UNOI housed these youth members with other non-familial adult

members or in UNOI-operated dormitories or barracks.  UNOI did not always tell the

youth members' parents where or when they were "dispatching" their children.

14.     Each UNOI business had a manager, and each house or dormitory had an adult member

in charge. The members at each "temple" reported to the business and house managers.

These managers then reported to local officials, such as the First Lieutenant or Captain,

or sometimes directly to national officials such as the National Lieutenant.

15.     The defendants required the youth members to live in crowded conditions, follow a very

restricted diet, and work long hours in UNOI-operated businesses.  Conversely, the

defendants and their immediate families typically resided in spacious accommodations,

ate what they wanted, and worked at their own discretion.

<u>**COUNT 1**</u>
**CONSPIRACY TO COMMIT FORCED LABOR**
**[18 U.S.C. § 371]**

16.     On or about October 28, 2000 and continuing through November 30, 2012, in the District

of Kansas and elsewhere, the defendants,

**KAABA MAJEED,**
**YUNUS RASSOULL, a.k.a. Yunus Rassoul**
**JAMES STATON, a.k.a. Adam Winthrop,**
**RANDOLPH RODNEY HADLEY,**
**DANIEL AUBREY JENKINS,**
**DANA PEACH,**
**ETENIA KINARD, a.k.a. Etenia Kinnard, and**
**JACELYN GREENWELL,**

and others known and unknown to the Grand Jury, did knowingly conspire and agree

with each other to provide and obtain the labor and services of one and more persons by

threats of serious harm to, and physical restraint against, that person and another person; by means of any scheme, plan, and pattern intended to cause the person to believe that, if the person did not perform such labor and services, that person and another person would suffer serious harm and physical restraint; and by means of the abuse and threatened abuse of law and the legal process, in violation of 18 U.S.C. § 1589.

Object of the Conspiracy

17.   The factual allegations in paragraphs 1 through 15 of this Indictment are incorporated by reference and realleged as though fully set forth herein.

18.   The object of the conspiracy was for the defendants, and others known and unknown to the grand jury, to obtain the uncompensated labor and services of at least one victim in the District of Kansas and elsewhere.

Manner and Means of the Conspiracy

The manner and means by which the co-conspirators carried out the object of the conspiracy included, but were not limited to, the following:

19.   Although members could be any age, the defendants primarily relied on the labor and services of young victims, many of whom were minors, to benefit financially.  UNOI compelled the labor and services of victims as young as eight years old.

20.   The defendants very rarely allowed the victims to live with their parents.  They instead housed the victims in overcrowded dormitories, barracks, or households of adult members who were not related to the victims.

21.   Jenkins created rules to control the victims while the other defendants enforced the rules.

22. The defendants controlled the whereabouts of all of the victims. The defendants transported the victims to different cities on a regular basis, sometimes with mere hours' notice.

23. Jenkins controlled what the members viewed and read. He generally restricted victims to reading UNOI publications and did not allow outside newspapers or books.

24. The defendants required the victims to dress in UNOI-made clothing and use UNOI-produced toiletries. Victims had to make official requests for outside clothing or toiletries, and the defendants routinely denied such requests.

25. The defendants also restricted communications. They often required the victims to ask permission to speak, and prohibited victims from using certain words such as "hello," and "say." The defendants generally prohibited victims from speaking to members of the opposite sex, or to non-members, including non-members from their own families. The defendants also controlled whether victims could speak to their families and parents within UNOI and often monitored those calls.

26. The defendants directed the victims to shower in a certain way and required some victims to undergo colonics performed by adult members. A colonic is a procedure designed to cleanse the colon by streaming gallons of water through a tube inserted into the rectum.

27. The defendants controlled the diet of their members, restricting many of the victims to eat only bean soup, salad, and occasionally fruit. They also restricted many of the victims to two meals per day, or ordered them to "cleanse" by consuming only lemon juice for days. The defendants required the victims, particularly female victims, to maintain a certain weight. Jenkins's wives subjected female victims to weekly weigh-ins where they would humiliate the victims for their weight and subsequently make them fast.

28.  The defendants did not allow the victims to come and go freely from their residences. With few exceptions, the defendants required the victims to be transported or accompanied everywhere by a UNOI member, usually an official or trusted member.

29.  The defendants rarely permitted victims to seek outside medical attention. The defendants often denied victims medical attention altogether. When a defendant did allow a victim to receive medical attention, they sent the victim to a doctor employed by UNOI or to **PEACH,** who was not a licensed medical doctor. **PEACH** would then personally "treat" the victims herself.

30.  The defendants required the victims to perform "duty," which consisted of working long hours without pay in UNOI-owned businesses such as bakeries, restaurants, gas stations, a sewing factory, a factory that produced personal hygiene products, and others. The defendants also required many victims to perform "duty" in households, such as cleaning and childcare. The defendants required some victims to work up to 16 hours per day without compensation.

31.  The defendants did not permit the victims to receive an accredited education from a licensed school. UNOI ran its own unlicensed school known as the "University of Arts and Logistics of Civilization" (UALC) in Kansas City, Kansas, in the District of Kansas. Victims who lived in Kansas City, Kansas attended the UALC but did not receive appropriate instruction in traditional subjects such as mathematics, reading, writing, and science. The defendants denied the victims who lived outside of Kansas City, Kansas of any legitimate education, and required them to provide labor in lieu of attending school.

32.  The defendants regularly conducted meetings with large groups of members to humiliate the victims and other members who committed "infractions." Infractions included failing

to follow rules or properly perform "duty," as well as innumerable other offenses, such as stealing food. During these meetings, the defendants called victims to a microphone in order to humiliate them by announcing their infraction and punishment to other members.

33.  The defendants regularly punished the victims who committed infractions. The punishments included withholding food, silence, public humiliation, extra "duty," and physical abuse. Physical abuse included hitting victims with a paddle, among other actions.

34.  The defendants instilled in the victims a fear of noncompliance and a fear of leaving UNOI and UNOI housing. The defendants promoted the idea that the victims "owed a duty to Allah," which meant working at UNOI businesses. The defendants convinced the victims that if they did not comply with the rules, including performing their "duty," or if they left UNOI, they would burn in an "eternal hellfire" or experience tragedy.

<u>Overt Acts</u>

35.  In furtherance of the conspiracy, and to accomplish the object of the conspiracy, at least one of the defendants committed or caused to be committed at least one of the following overt acts, among others, in the District of Kansas, and elsewhere:

36.  In or about and between October 2002 and October 2003, **KINARD** and **GREENWELL** punished Shakira Mullen, whose identity is known to the grand jury, for burning a pie at the UNOI-operated bakery in Kansas by requiring Shakira Mullen to make extra pies and causing Shakira Mullen to work until midnight.

37. On or about and between October 28, 2000 and December 31, 2004, **AUBREY,**
**MAJEED,** and **HADLEY** used a paddle to hit Devon Young, whose identity is known to
the grand jury, as punishment on multiple occasions in Kansas.

38. In or about and between 2003 and 2005, **KINARD** beat Amira Kelly, whose identity is
known to the grand jury, with an extension cord for neglecting to throw out a diaper
while Amira Kelly provided childcare in a UNOI-run household.

39. On or about and between 2004 and 2006, **RASSOUL** refused to allow Amira Kelly to
seek proper medical attention and recuperate when Amira Kelly fainted from fatigue and
hit Amira Kelly's head on a brick floor while working at a restaurant that **RASSOUL**
managed in Connecticut.

40. In or about and between 2004 and 2006, **STATON** denied Niesha King, whose identity is
known to the grand jury, use of Niesha King's inhaler to treat Niesha King's diagnosed
asthma when Niesha King lived and performed household work in his home, located in
Kansas.

41. In or about 2007, Jenkins and **PEACH** transported Shakira Mullen from Kansas to New
Jersey for the purpose of securing Shakira Mullen's labor.

42. On or about and between October 28, 2000 and December 31, 2008, Jenkins, **MAJEED,**
**RASSOUL, AUBREY, STATON, KINARD, PEACH,** and **GREENWELL** made
decisions about where in the country to move victims for labor. The defendants made
these decisions through in-person discussions that occurred in the District of Kansas or
through telephonic discussions in which some defendants were physically present in the
District of Kansas.

43.  On or about and between October 28, 2000 and December 31, 2008, Jenkins, **MAJEED,**
     **RASSOUL, AUBREY, STATON, KINARD,** and **GREENWELL** participated in
     meetings to decide which disciplinary action to impose on victims, such as withholding
     food. The defendants made these decisions through either in-person discussions that
     occurred in the District of Kansas or telephonic discussions in which some defendants
     were physically present in the District of Kansas.

44.  In or about 2008, **MAJEED** instructed victims to lie to customers about their age and
     working status so that they could continue to work in the restaurant that he managed in
     New York.

45.  Beginning on or about October 28, 2000 and continuing through on or about December
     31, 2009, all dates being approximate and inclusive, **GREENWELL** was responsible for
     youth-related matters.  In this capacity, she made decisions about victims' labor and
     services, as well as whether and how to discipline victims.

46.  Beginning on or about and October 28, 2000 and continuing through on or about
     December 31, 2009, **AUBREY** engaged in "Fruit of Islam Beatdowns" or "FOI
     Beatdowns" in which he physically abused male UNOI members as punishment for
     infractions.

47.  In or about and between 2008 and 2009, **MAJEED** transported Amira Kelly from Kansas
     to New Jersey for the purpose of securing Amira Kelly's labor.

48.  In or about and between 2008 and 2009, Jenkins announced to victims and members that
     he had his daughter killed for leaving UNOI.

49. In or about and between 2008 and 2009 Elijah Muhammed, whose identity is known to the grand jury, and who was a local UNOI lieutenant in Kansas at the time, observed **HADLEY** punish a member by knocking him unconscious in the District of Kansas.

50. In or about and between 2008 and 2009, after Elijah Muhammed reported to Jenkins that **HADLEY** had punished a member too harshly, Jenkins indicated that he agreed with **HADLEY'S** punishment.

51. In or about and between 2008 and 2009, as a result of Elijah Muhammed reporting **HADLEY** to Jenkins, **MAJEED** punished Elijah Muhammed by not allowing Elijah Muhammed to speak without permission, requiring Elijah Muhammed to perform extra work hours, and stripping Elijah Muhammed of Elijah Muhammed's position as lieutenant.

52. **REDACTED**

53. On or about and between 2005 and 2011, **PEACH** supervised UNOI businesses in New Jersey and New York. In her roles as supervisor, she made decisions about victims' labor and services, as well as whether and how to discipline victims.

54. On or about and between October 28, 2000 and December 31, 2011, **KINARD** was responsible for youth-related matters. In this capacity, she made decisions about victims' labor and services, as well as whether and how to discipline victims.

55. In or about and between 2003 and 2012, **RASSOUL** supervised a UNOI-operated restaurant in Connecticut. In his role as supervisor, he made decisions about victims' labor and services, as well as whether and how to discipline victims.

56.  In or about and between 2005 and 2012, **MAJEED** supervised a UNOI location in New Jersey where multiple victims and other UNOI members lived in overcrowded conditions, such as ten or more individuals in a bedroom.

57.  In or about and between 2007 and 2012, **MAJEED** and **RASSOUL** supervised a UNOI-operated restaurant in North Carolina.

58.  On or about and between October 28, 2000 and January 2012, Jenkins, **MAJEED, RASSOUL, AUBREY,** and **STATON** led meetings in which they publicly chastised the victims and other individuals for violating UNOI rules.  The defendants held these meetings in the District of Kansas and elsewhere.

59.  Beginning in or about October 28, 2000 and continuing through in or about November 30, 2012, all dates being approximate and inclusive, in the District of Kansas and elsewhere, **HADLEY** used a paddle on multiple occasions to hit victims as punishment.

60.  On or about and between October 28, 2000 and November 30, 2012, **MAJEED** and **RASSOUL** supervised UNOI businesses in Kansas.  In their roles as supervisors, they made decisions about victims' labor and services, as well as whether and how to discipline victims.

61.  On or about and between October 28, 2000 and November 30, 2012, **MAJEED** and **HADLEY** engaged in "Fruit of Islam Beatdowns" or "FOI Beatdowns" in which they physically abused male UNOI members as punishment for infractions.

62.  On or about and between October 28, 2000 and November 30, 2012, Jenkins led and participated in meetings in which he addressed UNOI members and discussed UNOI principles.  Jenkins held these meetings in Kansas and elsewhere.

63.  On or about and between January 1, 2005 and November 30, 2012, **MAJEED** supervised UNOI businesses in New Jersey and New York.  In his role as supervisor, he made decisions about victims' labor and services, as well as whether and how to discipline victims.

In violation of Title 18, United States Code, Sections 371 and 1589.

## COUNTS 2 THROUGH 8
### FORCED LABOR
### [18 U.S.C. § 1589]

64.  Beginning on or about the dates listed below, and continuing through on or about the corresponding dates indicated below, in the District of Kansas and elsewhere, the below-named defendants, and others known and unknown to the Grand Jury, aiding and abetting each other and others, did knowingly provide and obtain the labor and services of the victims referenced in each respective count below, whose identities are known to the grand jury, by threats of serious harm to, and physical restraint against, that person and another person; by means of any scheme, plan, and pattern intended to cause the person to believe that, if the person did not perform such labor and services, that person and another person would suffer serious harm and physical restraint; and by means of the abuse and threatened abuse of law and the legal process, and attempted to do so:

| COUNT | VICTIM | DEFENDANTS | APPROXIMATE DATES OF FORCED LABOR |
|---|---|---|---|
| 2 | Amira Kelly | **Kaaba Majeed, Yunus Rassoul, James Staton, Dana Peach, Etenia Kinard, Jacelyn Greenwell** | October 28, 2000-August 31, 2012 |
| 3 | Tymiah Kelly | **Kaaba Majeed, Yunus Rassoul, James Staton, Etenia Kinard, Jacelyn Greenwell** | October 28, 2000-February 28, 2012 |

| 4 | Doneika Dempsey | **Kaaba Majeed, James Staton, Etenia Kinard, Jacelyn Greenwell** | October 28, 2000-November 30, 2012 |
| 6 | Kendra Ross | **Kaaba Majeed, James Staton, Randolph Rodney Hadley, Etenia Kinard** | January 1, 2001-November 30, 2012 |
| 7 | Elijah Muhammed | **Kaaba Majeed, James Staton, Randolph Rodney Hadley, Daniel Aubrey Jenkins, Jacelyn Greenwell** | January 1, 2002-November 30, 2011 |
| 8 | Niesha Kelly | **Kaaba Majeed, James Staton, Randolph Rodney Hadley** | January 1, 2004-March 31, 2012 |

In violation of Title 18, United States Code, Sections 1589, 1594(a), & 2.

INSTRUCTION NO. 4

For reasons that do not concern you, Count 5 is no longer before you.  Do not speculate about why Count 5 is no longer part of this trial.

The defendants are on trial only for the charges set forth in Counts 1, 2, 3, 4, 6, 7, and 8. You may consider the evidence presented only as it relates to these remaining counts.

INSTRUCTION NO. 5

For reasons that do not concern you, the case against codefendants Etenia Kinard, a.k.a.
Etenia Kinnard, and Jacelyn Greenwell, are no longer before you.  This fact should not influence
your verdicts with reference to the remaining defendants, and you must base your verdicts solely
on the evidence against the remaining defendants.

INSTRUCTION NO. 6

The Indictment charges that the crime was committed "on or about" a certain date. It is not necessary that the proof establish with certainty the exact date of the alleged crime. But the government must prove beyond a reasonable doubt that a defendant committed a crime reasonably near the date alleged.

INSTRUCTION NO. 7

Whenever the word "he" is used in these instructions, you may consider it as applying equally to a woman.

INSTRUCTION NO. 8

The Indictment charges each defendant with committing offenses in several ways, using the conjunctive language "and." However, the law is worded in the disjunctive, that is, the various modes or methods of violating the statute are separated by the word "or." It is sufficient if the government proves the offense in the disjunctive, that is, proof beyond a reasonable doubt that any one method or way of violating the law occurred.

INSTRUCTION NO. 9

To the charges contained in the Indictment, each defendant has entered a plea of "not guilty." These pleas put in issue every element of the crimes charged and make it incumbent upon the government to prove beyond a reasonable doubt every element of the crimes charged.

INSTRUCTION NO. 10

The law presumes a defendant to be innocent of crime.  This presumption remains with him throughout the trial.  Thus, a defendant, although accused, begins the trial with a "clean slate," with no evidence against him and the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against a defendant.  The presumption of innocence alone is sufficient to acquit the defendant now on trial, unless the jurors are satisfied of the defendant's guilt beyond a reasonable doubt, from all the evidence in the case.

INSTRUCTION NO. 11

The government has the burden of proving each defendant guilty beyond a reasonable doubt. The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving each defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find that defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of a defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning a defendant's guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that a defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

INSTRUCTION NO. 12

Burden of proof means burden of persuasion. The burden is always upon the government to prove beyond a reasonable doubt every essential element of the crimes charged. In determining whether or not it has met this burden, you must consider all the evidence.

INSTRUCTION NO. 13

A separate crime is charged against one or more of the defendants in each count of the Indictment.  You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant.

Your verdict as to any one defendant or count, whether it is guilty or not guilty, should not influence your verdict as to any other defendants or counts.

INSTRUCTION NO. 14

Count 1 of the Indictment charges each defendant with Conspiracy to Commit Forced Labor in violation of Sections 371 and 1589, Title 18, United States Code. For you to find each defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:      At some point between on or about October 28, 2000, and on or about November 30, 2012, the defendant agreed with at least one other person, whether a charged defendant or not, to violate federal law—namely, the crime of forced labor as described in 18 U.S.C. § 1589, as charged in the Indictment, and as I will explain and define to you in Instruction 22;

*Second*:    one of the conspirators engaged in at least one overt act furthering the conspiracy's objectives;

*Third*:     the defendant knew the essential objectives of the conspiracy, as alleged in paragraphs 1–18 of the Indictment;

*Fourth*:    the defendant knowingly and voluntarily participated in the conspiracy; and

*Fifth*:     there was interdependence among the members of the conspiracy—that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

INSTRUCTION NO. 15

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose.  It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of the other member.  The evidence may show that some of the persons involved in the alleged conspiracy are not on trial.  This does not matter.  There is no requirement that all members of a conspiracy be charged or tried together in one proceeding.  Once a person becomes a member of a conspiracy, he is held legally responsible for the acts of the other members done in furtherance of the conspiracy, even though he was not present or aware that the acts were being committed, unless and until the date he withdraws from the conspiracy.

The evidence need not show that the members entered into an express or formal agreement.  Nor does the law require proof that the members agreed on all the details.  But the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you are convinced that the charged conspiracy existed beyond a reasonable doubt, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be part of it.  The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out.  A person may belong to a conspiracy for a brief period of time or play a minor role.  A defendant's financial stake, if any, in the venture is a factor that may be considered in determining whether a conspiracy existed.  On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy.  Rather, the evidence must show the defendant knowingly joined the conspiracy with

the intent to advance its purposes.

You are also required to find that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit. To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose and that his or her actions constituted an essential and integral step toward the realization of that purpose.

INSTRUCTION NO. 16

In determining whether the conspiracy charged in Count 1 of the Indictment existed, you should consider the actions and statements of each defendant which were done to carry out an apparent criminal purpose, together with any reasonable inferences to be drawn from such evidence.  Proof concerning the accomplishments of the objects of a conspiracy may be considered as evidence of the existence of the conspiracy itself.  The offense of conspiracy is complete when the unlawful agreement is made and any single overt act to effect the object of the conspiracy is thereafter committed by a member of the conspiracy.  It is not necessary for the government to prove that the defendants actually succeeded in accomplishing their unlawful plan.

INSTRUCTION NO. 17

The government must prove beyond a reasonable doubt that during the existence of the conspiracy at least one member of the conspiracy performed at least one of the overt acts described in the Indictment, for the purpose of furthering or helping to achieve the objective(s) of the conspiracy.

The Indictment alleges certain overt acts. The government does not have to prove that all of these acts were committed or that any of these acts were themselves illegal. Also, the government does not have to prove that a defendant personally committed any of the overt acts. The government must prove beyond a reasonable doubt that at least one member of the conspiracy committed at least one of the overt acts alleged in the Indictment and committed it during the time that the conspiracy existed, for the purpose of furthering or helping to achieve the objective(s) of the conspiracy.

INSTRUCTION NO. 18

While the government must prove that there was an unlawful objective to the conspiracy, the government need not prove that the conspiracy had only a criminal purpose. In other words, it is not a defense to the conspiracy charge that the defendants may have had legal objectives as well as illegal objectives. However, the government must prove beyond a reasonable doubt that each defendant agreed to an unlawful objective.

INSTRUCTION NO. 19

Although Count 1 of the Indictment charges that the conspiracy existed from on or about October 28, 2000 and continued through November 30, 2012, it is not essential that the government prove that the conspiracy started or ended on or about those specific dates, except that the government must prove beyond a reasonable doubt that the conspiracy alleged in Count 1 continued on or after October 21, 2011, unless it involved the sexual or physical abuse, or kidnapping, of a child under the age of 18. It is sufficient if you find that the charged conspiracy was formed or existed for some time within the period set forth in the Indictment and you find beyond a reasonable doubt that the offense either continued on or after October 21, 2011, or involved the sexual or physical abuse, or kidnapping, of a child under the age of 18. In the event that you find that the offense did not involve the sexual or physical abuse, or kidnapping, of a child under the age of 18, then the government must convince you beyond a reasonable doubt that at least one overt act was committed for the purpose of advancing or helping the conspiracy on or after October 21, 2011.

Additionally, a defendant cannot be found guilty by you solely on evidence of acts that occurred prior to October 28, 2000.

INSTRUCTION NO. 20

One or more of the defendants have raised the affirmative defense of withdrawal from the conspiracy.

If you have first found a defendant was a member of the conspiracy charged in Count 1, then you must determine whether the defendant thereafter withdrew from the conspiracy.

In order to find that the defendant withdrew from the conspiracy, you must be convinced that the defendant has proven by a preponderance of the evidence that he took an affirmative step to defeat the purpose of the conspiracy, either by reporting to the authorities or communicating to his coconspirators that he was no longer participating in the conspiracy.

To prove a fact by a preponderance of the evidence means to prove that the fact is more likely so than not so.  This is a lesser burden of proof than to prove a fact beyond a reasonable doubt.

INSTRUCTION NO. 21

The government alleges that the defendants were co-conspirators of one another as well as others to include the following individuals:

Etenia Kinard
Jacelyn Greenwell
Royall Jenkins
Henry X Munoz
Akiba Majeed
KareemAllah Jenkins (aka Lamira Jenkins)
Nathan Ray
Dena Winthrop/Staton (aka Ayreena Winthrop)
Jason Winthrop/Staton
Dr. Marvin McIntosh
Aisha Mohammed
Deborah White
Yvette Seeney
Joy Jones
Zeena Leeks
Oswanna Silver
Dawneena Archie
Leola Linda Ragland
Dr. Raymond Satterwhite
Fatima Jenkins
Jeri Greenwell
Michael 7X King
Moreen Jenkins
Myesha Jenkins
Larry Cephus (aka Larry X)
Erica Bennerman
Leslie Brown
Reginal Gray
Aimee Woods
Laota L. Rassoull
Laota D. Rassoull

INSTRUCTION NO. 22

Counts 2, 3, 4, 6, 7, and 8 of the Indictment charge the defendants with Forced Labor in

violation of Section 1589, Title 18, United States Code as follows:

| COUNT | VICTIM | DEFENDANTS | APPROXIMATE DATES OF FORCED LABOR |
|---|---|---|---|
| 2 | Amira Kelly | Kaaba Majeed, Yunus Rassoul, James Staton, a.k.a. Adam Winthrop, Dana Peach, | October 28, 2000-August 31, 2012 |
| 3 | Tymiah Kelly | Kaaba Majeed, Yunus Rassoul, James Staton, a.k.a. Adam Winthrop, | October 28, 2000-February 28, 2012 |
| 4 | Doneika Dempsey | Kaaba Majeed, James Staton, a.k.a. Adam Winthrop, | October 28, 2000-November 30, 2012 |
| 6 | Kendra Ross | Kaaba Majeed, James Staton, a.k.a. Adam Winthrop, Randolph Rodney Hadley | January 1, 2001-November 30, 2012 |
| 7 | Elijah Muhammed | Kaaba Majeed, James Staton, a.k.a. Adam Winthrop, Randolph Rodney Hadley, Daniel Aubrey Jenkins | January 1, 2002-November 30, 2011 |
| 8 | Niesha King | Kaaba Majeed, James Staton, a.k.a. Adam Winthrop, Randolph Rodney Hadley | January 1, 2004-March 31, 2012 |

This law makes it a crime to obtain labor or services from another person by the use of, or

threatened use of, coercive means.

For you to find each defendant guilty of this crime, you must be convinced that the

government has proved each of the following elements beyond a reasonable doubt:

*First*:          on or about the date listed in the Indictment, the defendant knowingly provided or

obtained the labor or services of the person named in that particular count of the

Indictment (for example, Amira Kelly for Count 2); and

*Second*:        the defendant knowingly used at least one of the following prohibited means:

a)        threats of serious harm to, or physical restraint against, the person named

in that particular count of the Indictment or another person; or

b)        any scheme, plan or pattern intended to cause the person to believe that

non-performance of the labor or services would result in serious harm to,

or physical restraint against, the person named in that particular count of

the Indictment or another person.

INSTRUCTION NO. 23

In considering the first element of a forced labor charge, you must decide beyond a reasonable doubt whether a defendant knowingly provided or obtained the labor or services of another person—namely, the alleged victim named in that particular count of the Indictment.

I instruct you that, in considering this element, the words "provide," "obtain," "labor," and "services" are to be given their ordinary meanings.

If you find beyond a reasonable doubt that the defendant provided or obtained the labor or services of the alleged victim named in the particular count of the Indictment that you are considering, then the first element has been satisfied.

INSTRUCTION NO. 24

In considering the second element of a forced labor charge, you must find beyond a reasonable doubt that one or more of the following prohibited means was knowingly used by the defendant to provide or obtain the labor or services of the alleged victim named in that count of the Indictment:

    a)    threats of serious harm to, or physical restraint against, the alleged victim or another person; or

    b)    any scheme, plan or pattern intended to cause the person to believe that non-performance of the labor or services would result in serious harm to, or physical restraint against, the alleged victim or another person.

The term "serious harm" means any harm, whether physical or non-physical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances as the alleged victim to perform or to continue performing labor or services in order to avoid incurring that harm.

In determining what "a reasonable person in the same situation as the victim" would do, or what an alleged victim "reasonably believed," you may consider, for example, the method or form of the threats or "scheme, plan, or pattern" used in relation to that the alleged victim's particular station in life; his or her background, age, physical and mental condition or special vulnerabilities, if any; his or her experience, education, intelligence, any inequalities between the alleged victim and the defendant with respect to these considerations; and any reasonable means the alleged victim may have had to escape.

To prove this second element, the government is not required to link specific threats or actions taken against the alleged victim to particular labor tasks performed. Instead, the government needs to establish that there was a connection between the threats made or physical restraint by the defendant(s) and the labor and services she rendered. Thus, the government could satisfy the second element by showing a connection between punishments imposed by the defendant(s) and the labor or services at issue, or a climate of fear that was sufficient to cause the alleged victim to perform labor or services against their will.

As long as you unanimously find beyond a reasonable doubt that a defendant provided or obtained the labor or services of the alleged victim by one or more prohibited means as described above, the second element has been satisfied and you do not need to unanimously agree with respect to which means he or she provided or obtained the labor or services.

The government does not need prove that a defendant used chains, barbed wire, or locked doors for you to find the defendant guilty of forced labor, so long as you find that a defendant used one or more of the other prohibited means to provide or obtain the alleged victim's labor or services. A person who has been placed in fear of serious harm by a defendant's use of one of the prohibited means previously outlined is under no affirmative duty to try to escape.

INSTRUCTION NO. 25

A person acts knowingly if he acts voluntarily and purposefully, and not because of mistake or inadvertence or other innocent reason.  Whether the defendant acted knowingly may be proven by the defendant's conduct and by all of the facts and circumstances surrounding the case.  The term "knowingly" does not require the government to prove that a defendant knew he was violating a specific federal law.

INSTRUCTION NO. 26

Although Counts 2, 3, 4, 6, 7, and 8 of the Indictment charge that those offenses occurred during certain date ranges, it is not essential that the government prove that the offenses occurred on or about those specific dates, except that the government must prove beyond a reasonable doubt that the offenses alleged in Counts 2, 3, 4, 6, 7, and 8 continued on or after October 21, 2011, unless it involved the sexual or physical abuse, or kidnapping, of a child under the age of 18.  It is sufficient if you find that the offense was formed or existed for some time within the period set forth in the Indictment and you find beyond a reasonable doubt that the offense either continued on or after October 21, 2011, or involved the sexual or physical abuse, or kidnapping, of a child under the age of 18.

Additionally, a defendant cannot be found guilty by you solely on evidence of acts that occurred prior to October 28, 2000.

INSTRUCTION NO. 27

Counts 2, 3, 4, 6, 7, and 8 of the Indictment also charge a violation of Section 2, Title 18, United States Code, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime. To find a defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:        every element of the charged crime as outlined in Instruction 22 was committed by someone other than the defendant, and

*Second*:        the defendant intentionally associated himself or herself in some way with the crime and intentionally participated in it as he or she would in something he or she wished to bring about. This means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him or her.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

INSTRUCTION NO. 28

In Counts 2, 3, 4, 6, 7, and 8 of the Indictment, the defendants are also charged with attempting to commit the crime of forced labor in violation of Section 1594(a), Title 18, United States Code. It is a crime for anyone to attempt to commit a violation of certain specified laws of the United States. In this case, in Counts 2, 3, 4, 6, 7, and 8, the defendants are charged with committing forced labor and attempting to commit forced labor.

A defendant may be found guilty of attempting to commit a crime, even though he did not do all the acts necessary in order to commit the crime. However, a defendant may not be found guilty of attempting to commit any crime merely by thinking about it, or even by making some plans or some preparation for the commission of a crime.

For you to find a defendant guilty of attempting to commit the crime of forced labor, as I have defined the crime earlier, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:      the defendant intended to commit the crime of forced labor; and

*Second*:   that the defendant took a substantial step towards the commission of that crime.

A "substantial step" is an act which, in the ordinary and likely course of events, would lead to the commission of the particular crime. The step must be a strong indication of the defendant's criminal intent and must unequivocally mark the defendant's acts as criminal. It should demonstrate commitment to the crime charged.

INSTRUCTION NO. 29

The government contends that Conspiracy to Commit Forced Labor, as charged in Count 1 of the Indictment, and Forced Labor, as charged in counts 2, 3, 4, 6, 7, and 8 of the Indictment, involved the sexual or physical abuse, or kidnapping, of a child under the age of 18 years.

On the verdict form, only if you have found a defendant guilty of a charged offense, you will be asked to determine if that offense involved the sexual or physical abuse, or kidnapping, of a child under the age of 18 years. For a defendant to be involved in the sexual or physical abuse, or kidnapping, of a child, he or she must have either personally sexually or physically abused, or kidnapped, a child, or he or she must have been aware of the child's sexual or physical abuse, or kidnapping, and aided and abetted the perpetration of the abuse or kidnapping. Aiding and abetting have been previously defined at Instruction 27.

The term sexual abuse includes the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually explicit conduct or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children.

As used above, sexually explicit conduct means the actual or simulated sexual intercourse, including sexual contact in the matter of genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between persons of the same or opposite sex. Sexual contact means the intentional touching, either directly or through clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify sexual desire in any person.

The term physical abuse means to physically hurt, damage, or injure another, and can include maltreatment that causes or threatens to cause lasting harm.

Kidnapping occurs when one unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person.

As used above in the definition of kidnapping, inveigles means to entice, lure, or lead astray, by false representations or promises, or by other deceitful means.

INSTRUCTION NO. 30

In every crime there must exist a union or joint operation of act and intent.

The burden is always upon the government to prove both act and intent beyond a reasonable doubt.

INSTRUCTION NO. 31

The question of intent is a matter for you to determine.

Intent is a state of mind. Since it is not possible to look into a person's mind to see what went on, the only way you have of arriving at the intent of the defendant is for you to take into consideration all of the facts and circumstances shown by the evidence, including the exhibits, and determine from all such facts and circumstances what the intent of the defendant was at the time in question.

INSTRUCTION NO. 32

There are two types of evidence from which a jury may properly determine the facts of a case.  One is direct evidence, such as the testimony of an eyewitness.  The other is circumstantial evidence, the proof of a chain of circumstances pointing to the commission of the offense.

The law makes no distinction between direct and circumstantial evidence but requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case.

INSTRUCTION NO. 33

The weight to be given the evidence is determined not by the number of witnesses or the amount of testimony produced by either side, but by the credibility of the witnesses and the nature and quality of their testimony. The evidence of one witness who is entitled to full credit is sufficient for the proof of any fact in this case, and you would be justified in returning a verdict in accordance with such testimony even though a number of witnesses gave conflicting testimony, if from the consideration of the whole case and the reliability and credibility of the various witnesses you believe the one witness as opposed to the greater number of witnesses.

Always keep in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

INSTRUCTION NO. 34

Although you must consider all of the evidence, you are not required to accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness you should consider the witness's relationship to the government or to the defendant; any interest the witness may have in the outcome of the case; the witness's manner while testifying; the opportunity and ability to observe or acquire knowledge concerning the facts about which the witness testified; the witness's candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

When weighing conflicting testimony you should consider whether the discrepancy has to do with a material fact or with an unimportant detail, and should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

In addition, while you must consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in the case.

INSTRUCTION NO. 35

In considering the evidence in this case, you are expected to use your good sense; consider the evidence for only those purposes for which it has been admitted, and give it a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

You are to perform your duty without bias as to any party or person.  The law does not permit jurors to be governed by sympathy, prejudice, or public opinion.  That was the promise you made and the oath you took before being accepted by the parties as jurors and they have the right to expect nothing less.

Keep constantly in mind that it would be a violation of your sworn duty to base a verdict upon anything but the evidence in, and the law applicable to, this case.

INSTRUCTION NO. 36

As jurors, you are to focus on the individual facts, and not jump to conclusions that may have been influenced by unintended stereotypes or associations.  Try taking another perspective. Ask yourself if your opinion of the parties or witnesses or of the case would be different if the people participating looked different or belonged to a different group.  You must reach your own conclusions about this case individually, but you should do so only after listening to and considering the opinions of the other jurors, who may have different backgrounds and perspectives from yours.  You are to work together to reach a just result.

INSTRUCTION NO. 37

In Kansas, the law deems that any person who is at least 16 years old is capable of consenting to sexual relations, whether married or not. In other words, it is not a crime in Kansas to engage in consensual sexual activities with a 16-year old.  This was also the law during the time period at issue in this case.

INSTRUCTION NO. 38

The defendants are on trial only for the acts alleged in the Indictment.  They are not on trial for any other acts or conduct.  In determining whether each defendant is guilty or not guilty, you are therefore to consider only whether that defendant has or has not committed the acts charged in this Indictment.  Even if you are of the opinion that a defendant is guilty of some offense not charged in the Indictment, you must find that defendant not guilty if the evidence does not show beyond a reasonable doubt that the defendant committed the specific acts charged in the Indictment.

INSTRUCTION NO. 39

Evidence has been received in this case that certain persons, who are alleged to be co-conspirators, have done or said certain things. The acts or statements of any member of a conspiracy are treated as the acts or statements of all the members of the conspiracy if these acts or statements were performed or spoken during the existence of the conspiracy and to further the objectives of the conspiracy.

Therefore, you may consider as evidence against a defendant, any acts done or statements made by any members of the conspiracy, during the existence of and to further the objectives of the conspiracy. You may consider these acts and statements even if they were done and made in a defendant's absence and without his or her knowledge. As with all the evidence presented in this case, it is for you to decide whether you believe this evidence and how much weight to give it.

Acts done or statements made by an alleged co-conspirator before a defendant joined the alleged conspiracy may also be considered by you as evidence against a defendant. However, acts done or statements made before the alleged conspiracy began or ended may only be considered by you as evidence against the person who performed that act or made that statement.

INSTRUCTION NO. 40

There has been evidence presented which relates to possible unlawful acts and conduct of one or more defendants, other than the specific offenses with which he is charged and is on trial. You are instructed that this evidence has been admitted only for the limited purpose of showing knowledge and intent, if any, of said defendant with respect to the offenses with which he is charged. Such evidence of other unlawful acts of a like or similar nature may not be considered by you as proof the defendant is guilty of the specific offenses charged, but is relevant and may be considered by you only for the limited purposes I have just stated.

INSTRUCTION NO. 41

Evidence has been received regarding law enforcement methods and equipment used in the investigation of this case.  Likewise, evidence has been received concerning enforcement methods and equipment which were not used in relation to the investigation.

You may consider this evidence for the purpose of evaluating the weight of the evidence produced by the government and the credibility of law enforcement personnel involved in the investigation.  However, there is no legal requirement that the government, through its enforcement agents, must use all known or available crime detection methods or any particular type of equipment in its investigations.

INSTRUCTION NO. 42

You are instructed that the testimony offered by agents, officers or employees of the government shall not be given any greater weight or credibility by the fact alone of their office, but that such testimony should be weighed and considered as to the credibility on the same ground and for the same reason that the testimony of all other witnesses is weighed and judged.

INSTRUCTION NO. 43

A witness may be discredited or "impeached" by contradictory evidence, by a showing that he or she testified falsely concerning a material matter, or by evidence that at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness's present testimony.

If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

INSTRUCTION NO. 44

You have heard the testimony of Niesha King, Elijah Muhammed, and Tyneemah Jenkins, who were witnesses in the government's case. You also heard testimony from others concerning their opinion about these witnesses' character for truth-telling, and reputation, in the community where they lived, for telling the truth. It is up to you to decide from what you heard here whether these witnesses were telling the truth in this trial. In deciding this, you should bear in mind the testimony concerning these witnesses' reputation for truthfulness and their character for truth-telling.

INSTRUCTION NO. 45

The testimony of a witness who provides evidence against a defendant for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness.  The jury must determine whether the witness's testimony has been affected by interest, or by prejudice against a defendant.

INSTRUCTION NO. 46

An accomplice is one who unites with another person in the commission of a crime, voluntarily and with common intent. An accomplice does not become incompetent as a witness because of participation in the crime charged. On the contrary, the testimony that he or she is an accomplice may be received in evidence and considered by the jury, even though not corroborated by other evidence, and given such weight as the jury feels it should have.

The jury, however, should keep in mind that such testimony should be received with caution and considered with great care. You should not convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that unsupported testimony beyond a reasonable doubt.

INSTRUCTION NO. 47

You may consider the testimony of Etenia Kinard and Jacelyn Greenwell, who are codefendants who have pled guilty to charges related to the charges against the defendants in this case.

You may consider the guilty pleas only to the extent that you find that they bear upon the credibility of codefendants Etenia Kinard and Jacelyn Greenwell. The guilty pleas themselves are not evidence of the guilt of the defendants before you. You are not to consider the guilty pleas for any purpose other than in assessing the credibility of Etenia Kinard and Jacelyn Greenwell as a witnesses.

INSTRUCTION NO. 48

Defendants Yunus Rassoul and Kaaba Majeed have offered themselves as witnesses and testified from the witness stand. You are to determine the credibility of each defendant in the same way as you would consider the testimony of any other witness who took the stand.

INSTRUCTION NO. 49

Defendants James Staton, also known as Adam Winthrop; Randolph Rodney Hadley; Daniel Aubrey Jenkins; and Dana Peach did not testify and I remind you that you cannot consider their decision not to testify as evidence of guilt. You must understand that the Constitution of the United States grants to a defendant the right to remain silent. That means the right not to testify. That is a constitutional right in this country, it is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify or call any witnesses.

INSTRUCTION NO. 50

Evidence relating to any alleged statement, confession, admission, or act or omission alleged to have been made or done by a defendant outside of court and after a crime has been committed should always be considered by the jury with caution and weighed with great care. Any such alleged statement, confession, or admission should be disregarded entirely unless the other evidence in the case convinces the jury beyond a reasonable doubt that the statement, confession, admission, or act or omission was made or done knowingly and voluntarily.

In determining whether any statement, confession, admission, or act or omission alleged to have been made by a defendant outside of court and after a crime has been committed was knowingly and voluntarily made or done, the jury should consider the age, training, education, occupation, and physical and mental condition of the defendant and his treatment while in custody or under interrogation as shown by the evidence in the case. Also consider all other circumstances in evidence surrounding the making of the statement, confession, or admission.

If after considering the evidence you determine that a statement, confession, admission, or act or omission was made or done knowingly and voluntarily, you may give it such weight as you feel it deserves under the circumstances.

INSTRUCTION NO. 51

Statements, questions and arguments of counsel are not evidence, nor are transcripts of testimony displayed on visual aids evidence. The evidence consists of the sworn testimony of the witnesses and all exhibits received in evidence.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded. Anything you may have seen or heard outside the courtroom is not evidence, and must be entirely disregarded.

INSTRUCTION NO. 52

During the trial I may have questioned witnesses and passed upon objections to the admission of certain testimony or exhibits into evidence. Questions relating to the admissibility of evidence are solely questions of law for the court, and you must not concern yourselves with the reasons for my rulings. In your consideration of the case, you must draw no inference from these rulings and you must consider only the evidence which I admitted.

Neither in any question I have asked, nor in these instructions, nor in any ruling, action or remark that I have made during the course of this trial, have I intended to interpose any opinion or suggestion as to how I would resolve any of the issues of this case. If I have made any remark that you believe indicates how I would decide this case, I instruct you to disregard such remark.

INSTRUCTION NO. 53

The punishment provided  by law for the crimes charged is a matter exclusively within the province of the court and may not be considered by the jury in any way in deciding whether the defendant is guilty or not guilty of the crimes charged.

INSTRUCTION NO. 54

During your deliberations, that is when all of you are together in the jury room, you are released from the admonition regarding discussion of the case. The admonition regarding discussion remains in effect at any time when all of you are not in the jury room, or when you are away from the courthouse.

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals or other entities involved in the case. This means you may not use any electronic device or media (such as a phone, computer, or tablet), the internet, any text or instant messaging service, or any social media apps (such as Twitter, Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat) to research or communicate about what you've seen and heard in this courtroom.

These restrictions continue during deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and law presented in this courtroom. Information you find on the internet or through social media might be incomplete, misleading, or inaccurate. And, as I noted in my instructions at the start of the trial, even using your smartphones, tablets, and computers—and the news and social media apps on those devices —may inadvertently expose you to certain notices, such as pop-ups or advertisements, that could influence your consideration of the matters you've heard about in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial,

without undue influence by anything or anyone outside of the courtroom. For this reason, I expect you to inform me at the earliest opportunity, should you learn about or share any information about this case outside of this courtroom or the jury room, or learn that another juror has done so.

The alternate jurors will not be allowed to participate in deliberations but they remain bound by all aspects of the admonition. The clerk's office will notify the alternate jurors of the verdict and, if appropriate, when they will need to return.

INSTRUCTION NO. 55

During your deliberations, you may refer, if you wish, to any notes you took during the trial.  Remember, however, that your notes are not evidence and remember, also, that it is your memories regarding the evidence, and not your notes, which control.

INSTRUCTION NO. 56

Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous, and it must be unanimous as to each count and each defendant.

It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

## INSTRUCTION NO. 57

Upon retiring to the jury room, you should first select one of your number to act as your foreperson, who will preside over your deliberations and will be your spokesperson here in court. A form of verdict has been prepared for your convenience.

You will take the verdict form to the jury room, and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill it in, date and sign it, and then return to the courtroom.

If, during your deliberations, you should desire to communicate with the court, please reduce your message or question to writing, signed by the foreperson and pass the note to my law clerk, who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you return to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should never state or specify your numerical division at the time.

INSTRUCTION NO. 58

A final suggestion by the court—not technically an instruction upon the law—may assist your deliberations.  The attitude of jurors at the outset of and during their deliberations is important.  It is seldom productive for a juror, immediately upon entering the jury room, to make an emphatic expression of his or her opinion upon the case or to announce a determination to stand for a certain verdict.  The reason is obvious:  we are all human and it is difficult to recede from a position once definitely stated, even though later convinced it is unsound.

Jurors are selected for the purpose of doing justice.  This presupposes and requires deliberation—counseling together in an effort to agree.  Have in mind at all times, therefore, that you are a deliberative body, selected to function as judges of the facts in a controversy involving the substantial rights of the parties.  You will make a definite contribution to administration of justice when and if you arrive at a just and proper verdict under the evidence which has been adduced.  No one can ask more and you will not be satisfied to do less.

Date: _Sept. 10, 2024_

_Julie A. Robinson_
Julie A. Robinson
United States District Judge