IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
                **Plaintiff,**          **CASE NO.: 21-CR-20060-JAR**

     **Vs.**

KAABA MAJEED,
                **Defendant,**

## RULE 33 MOTION FOR NEW TRIAL

Comes now, the defendant, Kaaba Majeed, by and through counsel, W. Scott

Toth, and hereby moves pursuant to Federal Rule of Criminal Procedure 33 that the

defendant be granted a new trial. In support thereof, the defendant alleges as follows:

### Procedural history

On September 17, 2024 after more than six weeks in trial the jury found

defendant Majeed guilty of conspiracy to commit forced labor in violation of Title 18 of

the United States Code § 371 and 1589. Additionally, defendant Majeed was found guilty

of substantive counts of forced labor in violation of Title 18 United States Code § 1589 as

to count number two Amira Kelly, count number three, Tymiah Kelly, count number six,

Kendra Ross, count number seven, Elijah Muhammed, and count eight Niesha King.

Defendant Majeed argues that he should be granted a new trial in the interest of justice as

these verdicts are contrary to the weight and credibility of the witnesses and evidence.

### Analysis

Rule 33 of the Federal Rules of Criminal Procedure gives the Court authority to

grant a motion for new trial if it is in the interest of justice. In other words, if after

weighing the evidence and credibility of witnesses, the Court determines that "the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred," it may grant the defendant's motion. *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (quotation omitted). The Tenth Circuit agrees that in deciding a Rule 33 motion on these grounds, "the court may weigh the evidence and consider the credibility of the witnesses and grant a new trial" in exceptional cases where the evidence preponderates heavily against the verdict." (*See* Evans at 593) For the court to grant the defendant's motion, the central questions is whether "the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *United States v. Gabaldon*, 91 F.3d 91, 93-94 (10th Cir. 1996)

### Improper rebuttal testimony

During the presentation of the Government's case in chief it attempted to present the testimony of a witness who was not provided on the Government's witness list. That person is Jamil Muhammed. The Government had never provided to the defendants any FBI reports from an interview of Muhammed during the voluminous discovery. However, during the trial Muhammed was reached out to by other complaining witnesses and urged to contact the FBI about an incident he alleges where defendant Majeed struck him. During the trial Muhammed did reach out to the FBI and they provided notes of an interview where Muhammed alleges that Majeed struck him. Defendant Majeed objected to the Government introducing this witness in its case in chief and rightfully so the Court sustained the objection. Afterward the Government rested. Some of the defendants presented their own witnesses. Defendant Majeed testified himself about the life and times of being a member in the UNOI. On cross examination the Government asked defendant Majeed if he had ever struck Jamil Muhammed to which he replied no. After

2

the defendant rested, the Government then announced its intention to call Jamil

Muhammed as a rebuttal witness. A sidebar then occurred where defendant Majeed,

through counsel, strenuously objected to the introduction of any testimony from

Muhammed as it was an obvious attempt to circumvent the Court's earlier order and

essentially do an end around the unfavorable ruling the Government had received in

having been barred from presenting Muhammed's testimony. The Court overruled

defendant Majeed's objection and allowed Muhammed to testify. He testified that he and

others had been watching pornography at one of the UNOI restaurants the evening

before. Apparently, someone had told defendant Majeed about it and as a result

Muhammed testified Majeed punched him as a result. This evidence was critical in that it

was the only testimony throughout the course of the six-week jury trial where anyone

alleged defendant Majeed having physically touched them. Although, it was another

example of an individual who cannot correlate any physical violence with being forced to

work.

      The defendant moves for a new trial based on this improper rebuttal testimony.

This was clearly a ploy by the Government to do an end around the rules of evidence.

Rebuttal evidence is evidence with is evidence which intents to disprove or contradict the

evidence to which it is contrasted. *Tamberg v. Sholtis*, 41 F.3d 1151, 1166 (10th Cir. 205).

It should be noted that at no point during defendant Majeed's testimony in his case in

chief did he bring the name of Jamil Muhammed to the jury's attention. It is only upon

cross-examination by the Government that his name was first mentioned. Because of the

defendant's denial the Government improperly characterized the Muhammed evidence as

proper rebuttal evidence, when in fact it was not and could have ultimately led the jury

down the pathway they took. When a party opens the door to a topic the admission of

rebuttal evidence on that topic becomes permissible. *See United States v. Burch*, 153 F.3d 1140, 1144 (10th Cir. 1998). However, in this particular instance it is clear that is was not the defendant that opened the door to the topic. It was the Government who had an obligation to present Muhammed's testimony in its case in chief but was not allowed to because it did not follow the rules set by the Court. It was highly prejudicial to defendant Majeed to allow this witness to testify. It is improper rebuttal because Muhammed's testimony goes to the issue of forced labor which was the burden the Government had to present in its case in chief. The Government attempted to introduce new evidence under the guise of rebuttal evidence. In essence they set Muhammed up to be a rebuttal witness which goes contrary to the Court's original ruling barring his testimony. It could not be more clear this was simple gamesmanship on the part of the Government to the detriment of defendant Majeed's rights.

The following witnesses were individuals who the defendant was convicted of substantive forced labor. A review of the transcript of the testimony of these witnesses shows nothing further from the truth. The evidence against Mr. Majeed by all of these next individuals was entirely nonexistent as it relates to Mr. Majeed committing forced labor against these individuals.

The references in regards to this and all transcripts reflects the page of the transcript number corresponding to the individuals testimony. Listed below are the references made my Amira Kelly regarding Kaaba Majeed and anything at all possibly related to forced labor committed by Mr. Majeed against Amira Kelly.

**A. Amira Kelly**

Transcript page 424:
> Q: Okay. When it came to physical punishment, would it be more likely that a female would deal it out to a female versus a male to a female?
> A: Yes.
> Q: And more likely that a male would deal it out to a male versus a female to a male?
> A: Yes.

Transcript page 432:
> A: When I was in New Jersey, Kaaba was on one of those calls. I had to switch houses as a result because it was said that I was negatively interfering with someone else in the household, so I had to leave that household and go to another one.
> Q: So who specifically told you, you had to move?
> A: Kaaba and Etenia.
> Q: That's Kaaba Majeed?
> A: Yes.

Transcript page 453:
> Q: Was physical discipline something that happened often in your time during UNOI?
> A: Yes.
> Q: Did it happen to you often?
> A: It was a common practice from – when I say common, I mean multiple times weekly at least from 12 and under. A little more sporadic until I was 14.
> Q: And who would – who would physically discipline you?
> A: Any of his wives, some of the other people that he had living in the house for him.

Transcript page 513:
> Q: In the calls you overheard, did you hear Kaaba talking about issuing discipline?
> A: Yes.

Transcript page 582:
> A: In 2012, right before I left the Nation, they started to pay members.
> Q: Did you get paid at any point?
> A: Yes.

Transcript page 614:
> Q: The leaving UNOI was especially difficult for you and your siblings?
> A: Yes.

Transcript page 615:

> Q: And one of the reasons why is that Royall told you that if you ever left he would kill you?
> A: Yes.
> Q: And that was true of your other siblings as well?
> A: Yes.
> Q: And you testified that part of the reason that you stayed was to protect your family?
> A: Yes.

Transcript page 620 & 621:

> Q: And you didn't see any physical punishment occur during math class?
> A: Correct.
> Q: You'd sometimes hear somebody being paddled?
> A: Correct.
> Q: But you didn't hear anybody else – you didn't hear any other type of punishment except for paddling, is that right, physical punishment?

Transcript page 645:

> Q: Okay. Now, if somebody does get kicked out, however, they can always request to return?
> A: Yes.
> Q: Okay. And if somebody wants to leave, they can request to exit; correct?
> A: Yes.
> Q: Full-time members can become part-time members and part-time members can become full-time members –
> A: Yes.

Were someone to even give the Government the benefit regarding this testimony it becomes clear that nowhere does Amira Kelly indicate either by speculation or by truth that Kaaba Majeed committed any criminal offense against her. There is no testimony about physical abuse to her, sexual abuse to her, or kidnapping whatsoever. The conviction regarding Amira Kelly should be as a matter of law, in the interest of justice, thrown out and a new trial given as it relates to her.

**B. Tymeiah Kelly**

Transcript page 3081:
> Q: Was there ever a time when you witnessed another youth member get paddled?
> A: Yes.
> Q: Can you tell the jury about that?
> A: That was in the earlier stage. I remember her name was Chelsea. Henry was paddling her. We all had to stand in a circle and watch her get paddled.
> Q: Do you remember who paddled her?
> A: Henry Munoz.

This case in the interest of justice should be dismissed.

**C. Kendra Ross**

Transcript page 3296:
> A: As far as I know, Kaaba was the head of, like, all of it there, maybe both locations, the Newark and Harlem restaurants, so he was basically, like the manager of the restaurants.
> Q: And that time do you recall what position or rank he held in The Nation?
> A: He was the national first lieutenant.

Transcript page 3302:
> Q: And what happened to you? What did Malik do?
> A: It was sexually inappropriate things while I was sleeping.

This case in the interest of justice should be dismissed.

**D. Elijah Muhammed**

Transcript page 1000:
> Q: So what happened on this day that made you late, if you recall?
> A: This particular day that I was late. I was just out on my own. I made a habit of just being late for duty, so that particular day I came in late.
> Q: Was it the first time you had been late?
> A: No.
> Q: So when you arrived at the diner, what happens?
> A: Immediately I walked in, Trevor Gatson, he had hit me in the mouth with a phone book, and then he began beating me on the back with that same phone book.
> Q: Were you – were you standing up as he's hitting you?
> A: No.
> Q: What happened to you after he hit you with the first blow?

A: When he hit me, initially the first hit knocked me to the ground. I was on the ground. I tried to get back up and he began to hit me over and over again with that book.

Q: Were there other people present to witness this?

A: Not that I recall.

Transcript page 1122:

A: I can remember a time where Joshua X Hamilton was put on fast – I'm sorry, on fast.

Q: And who put him on fast?

A: Supreme Captain Kaaba

Transcript page 1123:

Q: For how long was Joshua Hamilton put on fast?

A: Joshua Hamilton's fast discipline was different than what I had ever seen or witnessed. He was – the incident that he was put on, I can't remember exactly what the incident was, but I do know the discipline called for him to be put on a unlimited time to fast. The way it worked, he would fast a week, he would be allowed to eat bean soup and salad at the end of the week, and then the following next week he would be on the fast.

Q: Are you aware personally of how long that fast lasted?

A: Yes, it lasted about two or three weeks.

Q: Have you ever witnessed your brother being put on a fast, your brother Carl?

A: Yes.

Q: And what type of fast was he put on?

A: He was put on a three-day fast.

Q: Do you know who personally put him on that fast?

A: Yes.

Q: And who was that?

A: Supreme Captain Kaaba.

Transcript pages 1124:

Q: Did you personally witness any FOI beatdowns?

A: Yes.

Q: And describe what an FOI beatdown is?

A: An FOI beatdown is when a selected hand-picked men from the FOI group are directed to physically beat on a person who committed a infraction or had a scenario

Q: Approximately how many did you personally witness:

(Answer on transcript page 1125)

Transcript page 125:

A: I witnessed about – what I can recall about two of them.

Q: And can you recall who are the people who issued those beatdowns?

A: I can recall a few of them, yes.

Q: And who is that?

8

A: One was Aubrey Jenkins and Supreme Captain Kaaba and Captain Rodney.

Q: In the situations you personally saw, were they youth or adults?

A: Adults.

Q: Okay. Did you ever witness – outside of specific disciplines like that that we just saw, did you ever witness any other physical abuse or physical assaults?

A: Beyond what I –

Q: Beyond what you've described?

A: Not that I can recall.

Transcript page 1126:

A: Kaaba had called the barracks. At the time we were staying at Clinton Avenue. Kaaba called all the men from the e barracks out into the parking lot area where the vehicles are parked. He explained that a phone call was received from him, and the scenario was that Leif and Steffon were heard in the background by the caller watching porn. Supreme Captain Kaaba asked Leif and Steffon is this accurate? They said, "Yes," and he punched both of them in their mouths.

Transcript page 1132 & 1133:

Q: And how is it that you were able to leave the Nation?

A: At that time Kaaba – National Supreme Captain Kaaba had allowed others to leave. I too felt that the situation had made me – had gotten me to the point where I wanted my child to be in a different situation. And I had voiced that to supreme captain's wife, and his wife – Supreme Captain Kaaba's wife, Tiona Majeed. And she told Kaaba, and Kaaba had called me concerning that matter.

He had told me I did not have to be here if I don't want to anymore because we're getting rid of all the dead weight and we can arrange that. And he said, "Take your time, think about it and then let me know."

Q: And did you ultimately decide to leave?

A: Yes.

This case in the interest of justice should be dismissed.

**E. Niesha King**

Transcript page 2779:

Q: So tell me about what Kaaba coached you to say.

A: Yeah, my first week there, Kaaba let me know that I was to tell everybody that I was in a culinary arts program, and I was on an internship learning the logistics of cooking, and that I was on a summer internship. It ended in the summer, and I went back to Kansas; that's where I went to school. I was also coached by Kaaba that my new age was now 16 years old. I'm no longer 13. And this is something that we regularly – regularly rehearsed.

Transcript page 2790:

> A: I talked to Kaaba about it. I told him I wanted to go to school, I wanted to go to college.
>
> And he looked at me and laughed and told me I was stupid, told me I was dumb, and that – he's like, "you realize none of this education you had up until now counts. You know that; right?" He was like, "You ain't got your GED." And he was like, "Didn't you say your last grade was third grade?" I'm like, "Yeah."
>
> He's like, "Good Luck. None of this is accredited."
>
> So pretty much laughed at me and told me I was stupid.
>
> Q: Did he tell you you could leave if you wanted to?
>
> A: Yes. But at same point he was like, "You haven't been working in a few weeks and your legs are giving out." He's like, "You haven't been doing work anyway. I mean, You're useless." So, you know, he's like, "Leave if you want to. We're done with you anyway." That was exactly how Kaaba framed it. I felt like lame cattle at that point.

Transcript page 2791:

> Q: Eventually were you able to leave for good?
>
> A: Yes, I was, but even the circumstances was messed up. Kaaba did – I did tell him –
>
> Because he was , like, "Well, how are you getting to the airport?"
>
> And I told him I had a plan.
>
> He was like, "No, I'll take you. You want to leave; I'll take you."
>
> So he took me to the airport, threw all my things on the sidewalk, and pretty much told me to screw you.

Transcript Page 2803 & 2804:

> Q: All right. Now, as it relates to Kaaba, you testified that you would ask Kaaba to call your parents while you lived in New Jersey. Is that normal that you would ask fan official to do that instead of an MGT official since he's FOI?
>
> A: Correct. Yes, me and Kaaba had a very close relationship. I took care of some of his children, and I spent a lot of time in his home. He would invite me over to watch movies and things of that nature. So I would go directly to him about different concerns I had.
>
> Q: Okay, so you – whenever you had concerns, you would go to Kaaba because you felt like –
>
> A: It depends on what it was.
>
> Q: Okay. You felt comfortable enough with him; correct?
>
> A: I wouldn't say comfortable. I knew that I could go directly to him.

This case in the interest of justice should be dismissed.

Respectfully submitted:

GARRETSON & TOTH, LLC

/s/ W. Scott Toth
105 East Park
Olathe, Kansas 66061
Telephone:     (913) 948-6682
Facsimile:     (913) 948-6681
scott@garretsontoth.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically with the U.S. District Court for the District of Kansas with notice of case activity generated and sent electronically on this the 16th day of December, 2024, to all counsel of record in this case.

/s/ W. Scott Toth
W. Scott Toth