## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>                    ***Plaintiff,* vs.**<br><br>**YUNUS RASSOULL,**<br>                    ***Defendant*** | **Case No. 21-CR-20060-02-JAR** |

## YUNUS RASSOULL'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

**COMES NOW** the defendant, Yunus Rassoull, by and through counsel Tricia A. Bath, and pursuant to Rule 29 of the Federal Rules of Criminal Procedure, moves this Court for judgment of acquittal on the basis that the evidence is insufficient to sustain the conviction on Count I. In support of his motion Mr. Rassoull offers the following:

### Rule 29 dictates the granting of a judgment of acquittal in this case

Under Federal Rule of Criminal Procedure 29(a), the court, on a defendant's motion at the close of evidence, must enter a judgment of acquittal for any charged crime for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a). The court may reserve a decision on the motion, submit the case to the jury, and then decide the motion after the jury returns a verdict of guilty. Fed. R. Crim. P. 29(b). A defendant may also renew his motion after the jury has returned a verdict. Fed. R. Crim. P. 29(c)(1).

1

When considering a motion for judgment of acquittal, the court must "ask whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom." *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). As it seeks to answer this question, without weighing conflicting evidence, the court must determine whether the evidence, if believed, would establish each element of the crime beyond a reasonable doubt. *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004). A court should acquit if it finds that no rational jury could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Xiang*, 12 F.4th 1176, 1184 (10th Cir. 2021). The evidence must be substantial, and the verdict not based upon inference stacking. *United States v. Serrato*, 742 F.3d 461, 467 (10th Cir. 2014).

In this case, where the defendants renewed their motions at the close of all evidence, and Mr. Rassoull now renews his motion after the verdict, the court should also consider **the defendants'** evidence. *United States v. Penn*, No. 20-CR-00152-PAB, 2022 WL 1773812, at *2 (D. Colo. June 1, 2022), *citing United States v. Khanu*, 675 F. Supp. 2d 55, 61 (D.D.C. 2009) ("because Defendant also renewed his motion for acquittal at the close of all of the evidence and after the jury returned a verdict, the Court shall also separately consider whether, based on the evidence presented by Defendant, the Government has provided sufficient evidence to prove the elements of tax evasion beyond a reasonable doubt."). *See also United States v. Cervantes*, 920 F.2d 937, 1990 WL 200238, at *2 (9th Cir.

1990) (unpublished) (the court could consider both the government and defendant's evidence in deciding the Rule 29 motion).

"'The Rules of Criminal Procedure do not allow a defendant to wait until appeal' to challenge the sufficiency of the evidence." *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) (quoting *United States v. Goode*, 483 F.3d 676, 680 (10th Cir. 2007)). Thus, "a defendant must present claims of insufficient evidence in the first instance to the district court through a motion for a judgment of acquittal." *Id.* (citing *Goode*, 483 F.3d at 680–81; Fed. R. Crim. P. 29). Mr. Rassoull twice raised a **general sufficiency** argument by way of a Rule 29 motion for judgment of acquittal—once at the close of the government's evidence and again at the close of all evidence. Clearly, the jury agreed with his sufficiency claims as to counts 2 and 3. Today, Mr. Rassoull makes this motion a third time. Today, Mr. Rassoull again argues **generally:** that the government's evidence is insufficient to prove him guilty of any crime, to prove the exceptions to the statute of limitations, and that his evidence of withdrawal is sufficient to support acquittal.

Because he was convicted of only the conspiracy alleged in count 1 of the indictment, Mr. Rassoull offers some specific examples below to guide the court in its analysis of his general insufficiency claim. By providing these examples, Mr. Rassoull in no way waives his general claim of insufficiency as raised in both of his oral motions at trial and as renewed herein.[1]

---

[1] Undersigned counsel is aware of certain holdings which find that a defendant who makes a sufficiency challenge on specific grounds waives all grounds not specified in the motion.

**The evidence was generally insufficient to prove the elements of conspiracy**

To convict a criminal defendant of conspiracy, the government must prove (1) the defendant and another person agreed to violate the law, (2) the defendant's "knowledge of the essential objective of the conspiracy," (3) the defendant's "knowing and voluntary involvement," and (4) "interdependence among the alleged co-conspirators." *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000); *see also United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013). *United States v. Cushing*, 10 F.4th 1055, 1065 (10th Cir. 2021); *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (citing *United States v. Evans*, 970 F.2d 663, 668 (10th Cir.1992)).

**Element 1:  the defendant and another person agreed to violate the law**

Taking these elements in turn, the first step in proving a defendant guilty of conspiracy requires that the government prove that he agreed--with another person--to violate federal law. The evidence, even viewed in the light most favorable to the government fails to prove this first element.

While Mr. Rassoull acknowledges that no formal agreement or words or writing is necessary – there are no magic words that demonstrate a conspiracy—

---

*See United States v. Leffler,* 942 F.3d 1192, 1197. In light of these holdings, Mr. Rassoull, through counsel is making a general sufficiency challenge in this motion (while also directing the court to some specific areas of concern). To do otherwise, in light of the holding in *Leffler,* might render counsel's assistance ineffective for purposes of collateral attack.

the evidence must at least show that co-conspirators[2] "came to a mutual understanding." *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990). In other words, "An agreement between the defendants to violate the law is an essential element, which must be shown beyond a reasonable doubt." *United States v. Migliaccio*, 34 F.3d 1517, 1521 (10th Cir. 1994). As made clear in the cases cited above, a defendant must not only make some agreement with a co-conspirator, he must make an agreement "to violate the law." *Id.* In other words, "the prosecution must show that the offender acted with a specific intent to interfere with the federal rights in question." *United States v. Anderson,* 417 U.S. 211, 223-24. The evidence adduced by the government at trial fails to demonstrate such an agreement by Mr. Rassoull.

In its own pleading (Doc. 249 Government's *James* memorandum, p. 7), the government argued that the defendants "engaged in a conspiracy in which they procured the **unpaid** labor of children for the United Nation of Islam" (emphasis supplied). This, of course, is not the crime that the defendants were charged with conspiring to commit. Instead, the government was required to prove that **each** defendant **agreed** to obtain labor or services, not for free, but **by threats of serious harm, physical restraint, or by scheme, plan or pattern intended to cause the person to believe they would suffer serious harm if they did not**

---

[2] Elements of the offense of conspiracy are not satisfied unless one conspires with at least one true coconspirator. *United States v. Davis*, 995 F.3d 1161 (10th Cir. 2021)

**do the work and that they did so knowingly**—in violation of federal laws prohibiting forced labor.

While the government presented a great deal of evidence that witnesses (many of whom happened to be children) worked (for free) at UNOI businesses, they provided no evidence that **Yunus Rassoull agreed** with anyone **to obtain the witnesses' services by force or threat.** In fact, many of the witnesses testified as to their belief that UNOI was a cult or similar to a cult. All the witnesses with knowledge of Yunus' youth acknowledged their belief that Yunus had been brought into the cult at a very young age by his parents and had worked in the cult's businesses (as a child, for free) just as they had.[3]

Nearly all of the witnesses, including Yunus, testified to their belief in what they thought to be their "religion" and its many teachings, including that those who failed to follow the tenets of the "religion" would face spiritual consequences such as the concept of "hellfire." Not a single witness testified as to their knowledge or belief that Yunus himself did not *also* believe in the cult leader's teachings about doing "duty." In other words, no witness testified that Yunus knew that what he was preaching was untrue and that his messages were instead intended to scare them into working.

---

[3] These included government witnesses, whose testimony must be judged in the light most favorable to the government, as well as defense witnesses and the defendant, whose testimony this court is not required to ignore in making the Rule 29 inquiry when a motion is filed after the close of all evidence.

While many witnesses, including Yunus, testified that he had been chosen by Royall Jenkins to spread the "religious" teachings, Yunus' testimony that he was, like others, duped into believing these tenets was uncontroverted and was, in fact, supported by documents authored contemporaneously with his uncovering Royall as a fraud in the late summer of 2011. These documents (emails) are also uncontroverted. The documents offer a window into Yunus' intent—or lack thereof—that the witnesses cannot. They show--in real time--that Yunus, too, had believed that their free work was being done because they desired to serve their religion and their god. They show a complete lack of intent by Yunus to threaten people but rather a belief that he is teaching them how to follow a religion and how to give back to their religious family—all of which Yunus, like the others, had been brainwashed into believing was true.

Many witnesses testified as to their genuine belief in what can certainly now be seen as absurd claims by Royall (angels and spaceships flying into the sun; his ability to cause natural disasters).  Not a single one of them could testify that Yunus' belief was any different than theirs. Yunus' genuine belief in the "religion" was undisputed. Even the two witnesses (Kinard and Greenwell) who testified after having admitted to conspiring with Royall to obtain labor by force, were not able to give testimony that Yunus understood the objective of their conspiracy and knowingly agreed to it.

Thus, while the evidence may show that witnesses were *induced* to work because they believed it to be part of their religious duty and that failing at their

religious duties would subject them to spiritual damnation, it does not show that Yunus **agreed** with anyone **to use this threat** of serious harm ("hellfire") in order **to obtain the witnesses' labor** in violation of federal law. The evidence likewise does not show that Yunus used serious physical harm to obtain labor or that he agreed with anyone else to obtain labor by others' use of serious harm. (Indeed, even alleged instances of physical harm related not to labor but to other tenets of the "religion" and none were alleged to have been committed by Yunus).

**Element 2:  the defendant had "knowledge of the essential objective of the conspiracy"**

This brings us to the second element of a conspiracy conviction: the defendant's "knowledge of the essential objective of the conspiracy." *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000); *see also United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013). *United States v. Cushing*, 10 F.4th 1055, 1065 (10th Cir. 2021); *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (citing *United States v. Evans*, 970 F.2d 663, 668 (10th Cir.1992)). In Mr. Rassoull's case, this element ties closely with the first in that for him to have agreed with Royall Jenkins or anyone else to violate the forced labor laws, he must have had knowledge of Jenkins' essential objective.

The Supreme Court has held that "the parties in the criminal plan must agree to pursue the **same criminal objective.**" *Salinas v. United States*, 522 U.S. 52, 63-64 (1997)(emphasis supplied). This language from *Salinas* essentially merges

the first and second elements under our facts. In other words, for Yunus to have agreed with Royall to violate the forced labor laws, he must have understood that the objective was to obtain the benefits of the labor by forcing its performance through serious harm/threats of serious harm. He must have **known and agreed** that his preaching Royall's religious beliefs was intended to **force** members to work in order that Royall and others would obtain the benefit of that work.

The overwhelming evidence from both sides was that cult members were lured by the notion of black people supporting themselves and others. That their free labor/communal living was part of this goal. Moreover, members believed that if they followed Allah/Royall's teachings, they would live eternally. Parents were enticed by Royall to enter the cult, either as full or part time members, and to, respectively, bring or send their children to live within the communal housing of the cult under the guise of religion and education. This, according to the government's theory, was further proof of Royall's objective to obtain the benefits of labor by force or threat.

However, all the witnesses who testified that they were brought into the cult by their parents were of such an age that **Yunus would also have been a child at the time of the alleged enticement of their parents by Royall**. The evidence was that Yunus, only a handful of years older than many of the witnesses, was also a child, not attending school, separated from his parents, and working in the businesses for free as part of his duty, when the witnesses' parents came under the influence of the cult. Thus, the evidence does not support that Yunus shared

in Royall's objective to entice members to send their children to him only to force/threaten the children into working. Nor does it show that Yunus actually enticed anyone to join the cult or to bring their children into the cult. The witnesses who testified had all been brought into the cult by their parents when Yunus was still a child.

There was some evidence that Yunus worked in the same locations at the same times as some of the witnesses and that, because he was slightly older, he "supervised" them. For example, at the bakery in Kansas, if Tymiah was 8 years old, Yunus would have been 14 years old. She, testifying to something she perceived in 1998/1999, with the capacity of an 8 year old, believed him to be her "manager" at the time. Even assuming this to be true, this does not prove that Yunus was **forcing** Tymiah to work or shared in Royall's objective to obtain her labor or that of anyone else by force.[4] The Tenth Circuit has repeatedly held that a "leadership role" in an organization does not prove membership in a conspiracy. *See e.g., United States v. Zimmerman,* 943 F.2d 1204 (10th Cir. 1991)(Defendant's position of senior lawyer in the firm did not support conspiracy conviction absent evidence of participation in the conspiracy.)

Indeed, the fact that Yunus worked alongside or even "supervised" witnesses, if taken as true, would have put him in a place to hear from these witnesses that they did not want to work or for him to have to discipline or threaten

---

[4] The jury's verdict as to Count 3 tells us that the jury did not believe that Yunus forced Tymiah to work.

them if they protested their duty to work. Not a single witness testified that they ever told Yunus they disagreed with the concept of doing duty. Not a single witness testified that they objected to working and Yunus forced or threatened them to get back to work. In fact, to the contrary, Amira testified that when she fell at work (due to a fast that un-called/un-indicted witness Mariah K. had ordered), Yunus drove her home and told her she had the rest of the day off.[5] Though she testified that she returned to work the next day, she did not say that she voiced an objection to this to Yunus and he forced her to work anyway.[6]

Again, the law tells us that a conspiracy requires a "*shared,* single criminal objective" *United States v. Small*, 423 F.3d at 1182-3 (quoting *Evans*, 970 F.2d 663, 670)(emphasis in original). It tells us as well that the government must "prove by direct or circumstantial evidence 'that the defendant knew at least the essential objectives of the conspiracy, and the defendant knowingly and voluntarily became part of it.'" *Id.* at 1182–83 (quoting *Mendoza–Salgado*, 964 F.2d at 1005).'"

There is no direct evidence that Yunus knew of and shared in the essential objectives of the conspiracy. The circumstantial evidence from the government witnesses neither suggests that Yunus believed he was "forcing" people to work nor that he (or any one of them) understood that their shared situation was illegal until many years after Yunus and Kaaba (and other members of the board) had

---

[5] Amira p. 419

[6] The jury's verdict on Count 2 involving this witness tells us that they did not believe Yunus forced her to work.

discovered that they were being lied to and set about to end the UNOI behind Royall's back.

Notably, the board's first act after Yunus and Kaaba discovered that Royall had been lying to them was to tell members that they should be free to do whatever they wanted, including leaving their jobs and housing at the UNOI--without concern for offending Allah/suffering hellfire or other any other negative consequences. A number of witnesses (including those who testified for the government) testified to having heard this proclamation in 2011. Direct, uncontroverted email evidence also helps to timestamp this to the late summer of 2011. This testimonial and documentary evidence gives insight into the fact that Yunus did not understand that Royall's teaching--of living and working as part of their duty to Allah--was all untrue and part of Royall's unlawful forced labor scheme until the late summer of 2011. This evidence clearly demonstrates Yunus' lack of intent to enter into an agreement to force victims to work. The contemporaneous emails demonstrate Yunus' lack of *mens rea* in a way that no witness can and in a way that cannot be twisted to favor the government.

Emails from this same time period demonstrate that the **only** illegality of which Yunus was aware—and one to which he did not agree and over which he had no control—was that the UNOI may have been violating tax laws. These same emails demonstrate that he (and other members of the board) immediately set about to investigate and correct this possible tax law violation and spoke openly (via email) about their efforts. There are no similar emails suggesting that they had

been aware of an illegal forced labor scheme. Instead, they addressed their prior "belief" that they had all been voluntarily working for the good of the whole--and their new-found realization that this was a lie--by their efforts to relieve people of the notion that they owed a duty to work. In other words, as soon as Yunus understood that **Royall's objective had been to compel people to work for his own benefit,** he (and the rest of the board) did not join in this objective but instead took affirmative steps to frustrate the objective. The direct and circumstantial evidence does not support the theory that Yunus was aware of and shared in Royall's objective.

**Element 3:  the defendant had "knowing and voluntary involvement"**

The third element of conspiracy requires the government to prove knowing and voluntary participation. The government must prove "'that the defendant knew at least the essential objectives of the conspiracy, **and the defendant knowingly and voluntarily became part of it**.'" *Small*, 423 F.3d at 1182-83 (quoting *Mendoza–Salgado*, 964 F.2d 993, 1005)(emphasis supplied). *See also United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000)(element three is the defendant's "knowing and voluntary involvement"). The government failed to prove that Yunus knowingly or voluntarily participated in a conspiracy to obtain labor by force or threat.

The government's failures in this regard are intertwined with their failures as to the first two elements. That is to say that their evidence failed in the same ways

to establish that Yunus knowingly and voluntarily agreed to participate in Royall's scheme as it did to prove that Yunus even understood Royall's illegal objective (to disguise his cult as a religion and to use his followers' faith to force them to work for his and his wives' benefit). As such, much of Yunus argument as to the insufficiency of the evidence on the third conspiracy element is the same as for the first two elements.

As noted above, the undisputed evidence was that Yunus was brought into the cult by his parents at age six. Like the other witnesses, he was taken out of school. He was brought to Kansas by his parents but by age eleven he was living separately from his parents in the very same "barracks" where witnesses later lived. He was sent halfway across the country to do duty in UNOI businesses. He, like all of the witnesses, was taught that it was his duty to work in these businesses for the good of the whole and as part of the UNOI goal to please Allah.

At the start of the conspiracy period alleged in the indictment, Yunus was barely 15 years old. By that time, two thirds of his life had been spent in the cult. He did not know or remember a life outside UNOI and its teachings. And while the government presented evidence that at some point he was dubbed a "minister" by Royall and began to preach Royall's teachings, they provided no evidence to suggest that Yunus had learned these teachings to be false (and simply part of Royall's forced labor scheme) and had, at that point, knowingly and voluntarily decided to join Royall in his plan to force people to work for his financial benefit by threatening them with hellfire. Similarly, while there was evidence that physical

forms of force or threat were used (unrelated to work), there was no evidence that Yunus understood and agreed to others' use of physical force or threat thereof to obtain labor.[7]

The government attempted to present evidence from a couple of witnesses that at some point Yunus, akin to Royall, began to live better than others. However, these very same witnesses testified on cross-examination in ways that essentially mooted their direct testimony—admitting that they had been wrong, mistaken, or confused during their direct testimony. Amira K., for example, testified about her shared time in Connecticut with Yunus (who was at the time married to her sister). On cross-examination she admitted that Yunus did not have his own home but instead, like all members, lived with 12 or 14 people in Connecticut and even lived for a time in the same house that she had said on direct that he had not occupied— clarifying that he had not lived in the house *when she lived there*.[8] Tyneemah J. testified on direct about seeing babysitting Yunus' children and/or seeing nice toys at Yunus' home for his children. After being confronted on cross with the fact that Yunus had no children at the time, she had identified on direct, she admitted that

---

[7] There was no evidence that Yunus himself used physical force against anyone.

[8] Because these witnesses essentially admitted on cross that their direct testimony was inaccurate, their testimony on cross should not be considered "conflicting evidence," which undersigned counsel understands the court does not weigh in a Rule 29 analysis. Instead, the court should wholly disregard the statements on direct that were essentially recanted on cross. This should hold true for the testimony of the many witnesses who "corrected"—for lack of a better word—their testimony upon cross-examination.

she had been mistaken in her testimony, having confused him with another defendant.

The government, presumably, had advanced this type of evidence in hopes of proving that Yunus, who was otherwise similarly situated with their victims, had left his victim status behind by agreeing to join in Royall's illegal objective and beginning to live "lavishly" like Royall. They needed this evidence to show that at some (still-unknown) point Yunus went from being a victim to being a co-conspirator. The evidence, after being corrected by their witnesses during cross-examination, did not support this theory and thus did nothing to prove that Yunus had, at some unknown point, **knowingly and voluntarily** joined in Royall's objective.

Contrary to the government's efforts to advance this theory, Yunus presented undisputed evidence by way of both his testimony and documents from the time period in question that showed that he lived in the very home Amira had testified that he had made others live in while he lived in better housing. Testimony and contemporaneous evidence showed that he lived with 12 or 13 others (adults and children). This situation—living a life of sacrifice, communally with other members, and working in the UNOI businesses with them—continued until Yunus learned that all the members were being deceived about the reasons for their lives of sacrifice and set about to end Royall's scheme of living lavishly on the backs of the members. The evidence that Yunus lived, for the duration of the charged conspiracy, in homes just like (and in some cases with) the victims defeats the

government's theory that Yunus ever knowingly and voluntarily joined Royall's conspiracy and instead shows that he was as much a victim of the conspiracy as any of the victims who testified.

Other evidence, adduced from government witnesses, offers reliable insight into whether Yunus knowingly and voluntarily agreed to advance the objectives of Royall's illegal conspiracy to obtain labor by force or threat. Several government witnesses testified about the time period when—for reasons that were not known to them at the time—Yunus and other board members[9] made an announcement encouraging members to do what they wanted and assuring them that they would be free to leave with no repercussions. Examples of this are:

a. Doneika D.:  explaining that there was a plan for members to transition; people started getting paid; Royall was angry at what the board had done (p. 1698-1701);

b. Khalib B.:  described the board ending things; described the board being at odds with Royall (p. 2079-2080);

c. Tymiah K.:  described everything being dismantled and people being paid (p. 3143-3144); and

d. Stacey G.:  described that the board told people that Royall was no longer Allah and encouraged people to do whatever they wanted; explained that people could leave or stay, and board told people they could request money for their transition to life outside UNOI (p. 3443).

---

[9] As supported by evidence, Yunus and a handful of others were told in the summer of 2011 that they were becoming part of a newly formed Board of Directors. They did not seek this position, but rather had it bestowed upon them by Royall on the advice of Dr. Satterwhite. The reasons why Royall allowed this to be dictated by Dr. Satterwhite remain unknown.

In addition to these witnesses, the defense presented witnesses (e.g., Akiba Majeed, Atim Mohammad, Sharon Staton, Kaaba Majeed), who similarly corroborated Yunus' testimony that he and Majeed set about to end Royall's scheme in the late summer of 2011. The actions described by these witnesses substantiates Yunus' testimony that he did not know or understand that Royall was essentially defrauding everyone—by convincing everyone that they were all voluntarily working for the good of the whole because it was Allah's will when the truth was that Royall was living lavishly while they lived lives of sacrifice—until his and Majeed's conversation with Royall in late August of 2011. Their testimony as well as Yunus' testimony was further corroborated by tens of emails and an audio recording, all sent/made contemporaneously with the board's lengthy efforts to dismantle the UNOI.

The uncontroverted testimony, along with the emails and recording (authored contemporaneously with no motive to fabricate) offer reliable insight into Yunus' state of mind/*mens rea* at the time. It is clear from this evidence that Yunus had not knowingly and voluntarily joined a conspiracy wherein he agreed with Royall or anyone else to violate federal law by obtaining labor by force. In fact, these emails and recordings evidence an intent that is precisely the **opposite** of forced labor. These emails and recording show instead that by September of 2011, Yunus and others had made an announcement to the membership of UNOI encouraging them not to feel beholden to working in UNOI businesses or living in UNOI housing and assuring them that there would be no punishments or other

negative implications ("you won't lose your X"). Yunus and others spent the next year not forcing labor but instead sending would-be-laborers out to live their dreams--and doing so behind Royall's back.[10] This evidence, which is, again, uncontroverted, works to defeat any notion by the government that Yunus was knowingly involved in a conspiracy with Royall to obtain forced labor. His actions upon learning that Royall was using his claim of being Allah to obtain labor show that Yunus was never aware of Royall's illegal objectives and never knowingly joined in those objectives.

**Element 4: "interdependence among the alleged co-conspirators**

To satisfy the fourth element of the test for determining whether a conspiracy exists, namely, the existence of a common, illicit goal, "[w]hat is required is a

---

[10] The government's closing made much of the fact that members continued to work, for a time for free, in the businesses even after the board learned of Royall's deceit and told the members they were free to leave. Again, whether the members were paid or unpaid is not the issue before the court and not the question for the jury. Any argument by the government to the contrary was misleading to the jury and improper appeal to emotion.

The government also made much of the fact that it took the board nearly 18 months to completely dismantle UNOI. The government's opinion that there was a different and faster way to dismantle a cult was likewise an improper appeal to the jury's emotion. Government counsel argued in closing (and on direct of defendants): "You didn't tell them Royall wasn't god!!!" The evidence before this court was that **members were told they could leave without consequence** by September 2011. They were led to believe this was cleared with Royall—because the board knew of their unwavering belief in Royall and knew members would not leave if they believed it against his will. While it is true that they were not *made* to leave until 2012 (because so many refused to leave on their own), any **forced** labor was ended when members were made aware that there was no negative consequence for not working in the businesses.

*shared*, single criminal objective, not just similar or parallel objectives between similarly situated people." *Evans*, 970 F.2d at 670 (emphasis in original). The government must prove that the co-conspirators "intended to act together for their shared mutual benefit **within the scope of the conspiracy charged**." *United States v. Cushing*, 10 F.4th 1055 (10th Cir. 2021)(emphasis added). "[I]nterdependence exists where 'each co-conspirators['] activities constituted essential and integral steps toward the realization of a common, illicit goal.'" *United States v. Edwards*, 69 F.3d 419, 431 (10th Cir. 1995) (quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)). *United States v. Cushing*, 10 F.4th 1055, 1066 (10th Cir. 2021).

In this case, the evidence not only fails to establish that Yunus was united in (or even aware of) Royall's illicit goal, but also that his activities were essential or integral steps to Royall achieving his goal. The witnesses who testified for the government testified that they were either "born into" the cult (either as blood relatives of Royall or because their parents were already members when they were born) or were brought into the cult as young children (because their parents willingly came to Kansas with them or, in many cases, sent them to Kansas to live full-time in the cult).

Yunus, born in 1985, played no role in convincing these parents to become members of the cult and/or to bring their children into the cult. Once brought into the cult, these children, like Yunus, grew up in the cult adhering to the cult's rules (including doing "duty") because of their or their parents' membership and belief in

the "religion" taught by the cult. They did this in much the same way that, e.g., Opus Dei Catholics practice "mortification of the flesh" (fasting and silence rituals) or Christians practice regular church attendance as part of their religion—and require their children to do the same--to please their god. Yunus had no role in forcing these children to adhere to a religion that had been selected for them long before Yunus was in a position to entice anyone to the cult. Members followed the religion because they believed Royall was Allah. They chose this "religion" for their children as well. Some evidence suggested that if/when some children complained to their parents about the conditions, their parents declined to remove them from the cult (E.M., M.M.). As a result of these parents' long-standing belief in Royall, nothing Yunus did in his job as minister was integral to begin or continue Royall's illicit objective.

Certainly, there was evidence that Yunus worked in the cult in a "temple secretary"—type role in Connecticut in the latter days of the cult's existence. In this role, Yunus (like all the various un-indicted temple secretaries) was tasked by Royall with being responsible for the day-to-day logistics of businesses and housing in that state. Yunus created work schedules and kept track of deposits and worked with Royall (via the wives) to make sure housing logistics were workable. Still, as evidence proved, Yunus was, like all the other members—a worker being used by Royall to fulfill his objective. In this sense, it could be argued that Yunus' actions, like those of all the other members, were indeed integral to Royall

achieving his goal. Afterall, Royall couldn't obtain the benefit of forced labor without the work of his laborers.

What the government's evidence failed to prove however is that Yunus actions were taken with the intent to act **"within the scope of the conspiracy charged**." *United States v. Cushing*, 10 F.4th 1055 (10th Cir. 2021)(emphasis added). *Edwards* tells us that the interdependence necessary to prove the fourth element of a conspiracy charge requires that the activities in question constituted "essential and integral steps toward the realization of a common, illicit goal.'" *United States v. Edwards*, 69 F.3d 419, 431 (10th Cir. 1995) (quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)). The evidence is that Yunus and the other members agreed to work for free for the benefit of the whole or to please Allah. The evidence is that Yunus and other countless members (some in "leadership" roles or in "the Royall family" who were not charged) were unwitting and replaceable cogs in Royall's machine who never agreed to work together towards any illicit goal.

The evidence also fails to establish that Yunus "intended to act together [with Royall] for their **shared mutual benefit** within the scope of the conspiracy charged." *United States v. Cushing*, 10 F.4th 1055 (10th Cir. 2021)(emphasis added). Evidence at trial established that Royall and some of his wives lived a lavish lifestyle that was not shared by Yunus and others. Despite the government's efforts to adduce evidence of this sort against Yunus, the best they could marshal once cross examinations were over was that Yunus was at various times allowed

to drive a car. Even these time periods were admittedly linked to his being a food delivery driver (Maryland) and being involved with support raisers (Connecticut). Moreover, it was established that some of the victims were also allowed to drive (Amira). Clearly, Yunus did not enjoy "mutual" benefit with Royall from the labor of the members. To the contrary, Yunus lived and worked alongside the members— eating bean soup and salad just like them--under the same false belief that their free work was done for the good of one another.[11]

As this court examines the evidence of conspiracy against Yunus, it must do so with a meticulous eye for discerning the true evidence of conspiratorial agreement and actions **by him** as directed by *United States v. Lopez,* 576 F.2d 840 (10th Cir. 1978). In *United States v, Butler*, 494 F.2d 1246 (10th Cir. 1974), the Court commented on the duty of vigilance when addressing Rule 29 motions in a conspiracy case:

> We again emphasize that, while we must review the evidence in the light most favorable to the prosecution, when the evidence so viewed fails to generate more than mere suspicion or insinuation of guilt, the conviction cannot be sustained. The standard of proof required in criminal cases is a cornerstone of constitutional due process. In a case such as this one, involving numerous defendants, multiple transactions, and varying degrees of participation, the task of sifting the evidence relating to each defendant becomes particularly difficult, and a special danger exists that the degree of proof required for conviction might be relaxed. We shall be particularly vigilant in such cases to see that such a relaxation does not occur and that conviction is not predicated upon suspicion.

*Id.* at 1254.

---

[11] Amira p. 417.

Nearly two decades later, the Court reiterated this duty, reminding us that the Court must "be particularly vigilant" in conspiracy cases because of the risk "that a jury will be so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it will fail to differentiate among particular defendants." *United States v. Evans,* 970 F.2d 663, 674 (10th Cir. 1992). *Evans* warned that the Court must "scrupulously safeguard *each* defendant individually, as far as possible, from loss of identity in the mass." *Id.* at 668.

There was undoubtedly much evidence in this case that witnesses, many of them children at the time, lived in poor housing conditions or with people they did not like. They were required to do household chores as part of the effort "for the good of the whole" as well as for the stated purpose of being educated as to these things (cleaning, rearing children, cooking). They were required to maintain a certain diet, including fasting, which was also, apparently, used by some members as punishment for wrongdoing or for just being perceived as overweight. Colonics were part of the teachings, though, again, some testified that these were used as punishment. They were punished for things like viewing pornography and lying. They testified that they were physically punished in school via paddlings and other physicality.[12]

Even given clear evidence of perjury by some, there can be no doubt that— in the name of "religion" these witnesses endured difficult and traumatic

---

[12] There was no evidence of Yunus personally subjecting any witness to these things.

childhoods. Yet, there simply was not sufficient evidence **against Yunus Rassoull** that they endured these things as part of a forced labor conspiracy **in which Yunus knew the objectives and voluntary agreed to join**. Moreover, when considering the uncontroverted documentary evidence from fall of 2011, it is clear that once Yunus learned of Royall's conspiracy, he communicated to any would-be co-conspirators his lack of agreement with the conspiracy. All of the evidence, when meticulously examined, even in the light most favorable to the government, is insufficient to establish Yunus guilt beyond a reasonable doubt on Count I and is sufficient to establish that, even if the jury believes he entered the conspiracy, he withdrew by September 2011.

WHEREFORE, for the reasons set forth herein, Mr. Rassoull hereby moves this Court for an order adjudging him acquitted of Count 1 of the Indictment.

Respectfully submitted,

*/s/ Tricia A. Bath*

Tricia A. Bath          #18024
**BATH & EDMONDS, P.A.**
4000 W 114th Street, Suite 210
Leawood, KS 66211
(913) 652-9800; Fax (913) 213-1849
E-mail: tricia@bathedmonds.com
**Attorney for Yunus Rassoull**

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2024 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all interested parties.

*/s/ Tricia A. Bath*

Tricia A. Bath          #18024