## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                     Case No. 21-CR-20060

RANDOLPH HADLEY,

        Defendant.

---

### SENTENCING MEMORANDUM

Defendant Randolph "Rodney" Hadley, by and through his counsel, Michael C. Duma, respectfully submits this sentencing memorandum pertinent to the hearing presently scheduled for August 4, 2025.

### CASE POSTURE

Rodney Hadley is before this court after being convicted by jury of one count of Conspiracy to commit Forced Labor, a Class D Felony in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1589. A presentence investigation report (PSIR) has been completed and reviewed by the defendant, his counsel, and the counsel for the government.

The PSIR determined a guideline sentence of 360 months to life based on a total offense level of 41 and a criminal history category of II. (PSIR ¶ 118). The Statutory Maximum sentence is 60 months imprisonment. The

defendant issued objections to the PSIR, which were noted in the final PSIR filed July 10, 2025 (Document 604). In addition to those objections, Mr. Hadley asks this court to consider the following requests for departures and variances.

## INTRODUCTION

The Sentencing Reform Act, as modified by Booker, requires the Court "to take account of the sentencing guidelines together with other sentencing goals" when sentencing a defendant. *United States v. Booker*, 543 U.S. 220, 259 (2005). District judges should begin all sentencing proceedings by correctly calculating the applicable Guidelines range, otherwise known as the "guideline sentence." *Gall v. United States*, 552 U.S. 38, 49 (2007). In cases where the statutory maximum sentence exceeds the guideline sentence, the statutory max becomes the guideline sentence. *See* U.S.S.G. 5G1.1. The statutory maximum sentence is the benchmark when considering downward departures. *See U.S. v. Jones*, 233 F. Supp. 2d 1067, 1075 (E.D. Wis. 2002); *United States v. Murphy*, 591 Fed.Appx. 377, 382 (6th Cir. 2014). Thus, in Mr. Hadley's case, in considering whether to grant a departure or variance, this Court's staring point should be no more than 60 months.

While the "Guidelines should be the starting point and the initial benchmark," district courts should impose sentences based on appropriate consideration of all the factors listed in § 3553(a), subject to appellate review

for "reasonableness." *Gall v. United States*, 552 U.S. 38, 49 (2007). A district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Id.* at 50. In Mr. Hadley's case, such individualized assessment merits a departure from 60 months.

Mr. Hadley requests the Court impose a sentence of 5 years of probation with appropriate conditions. Such a sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing. The Defendant requests that the Court consider the following in support of his request.

1. **The Cult dynamic of the UNOI mitigates Mr. Hadley's culpability.**

The practices and culture of the UNOI were coercive upon Mr. Hadley and significantly impacted his ability to know the wrongfulness of his behavior as a young, immature man. A departure is warranted pursuant to USSG § 5K2.12 (Coercion and Duress) and USSG § 5K2.13 (Diminished Capacity). Alternatively, a variance is warranted pursuant to the factors set forth in § 3553(a).

This forced labor case against the UNOI is not your typical one. The UNOI was a national organization consisting of thousands of members ranging in ages from newborns to the very elderly. Its beliefs championed a

central figure (Royall Jenkins) as a living Messiah, and its stated goal was to create a heaven on earth for black people to live and thrive in anticipation of the ultimate rapture. Ultimately though, it was a scam generated solely by Royall Jenkins for him to achieve power and money. Mr. Hadley, on the other hand, entered the organization at an early age, at great personal sacrifice, and with good intentions.

Mr. Hadley was an impressionable youth attending college when he was recruited to the UNOI. The promises of black empowerment and independence from traditional society were very enticing to Mr. Hadley as a person who perceived himself to be disenfranchised from society as a young, black male. After becoming indoctrinated into the beliefs of the UNOI, Mr. Hadley came to truly believe that Royall Jenkins was divine and that his messages were divinely inspired. It is under these beliefs that Mr. Hadley surrendered his home, his possessions, his money, and his life over to Royall Jenkins. Unknown to Mr. Hadley at the time, his surrender to the UNOI was the result of a calculated, strategic plan implemented and maintained by Royall Jenkins.

Unlike the top-tier members who architected this coercive system, Mr. Hadley was himself indoctrinated, having spent years within the ideological and social control structure of the UNOI before reaching any level of authority. He joined the organization as a young adult, not as an external

opportunist. He did not hold national authority, was not a financial beneficiary, and was not a founding member. While he exercised supervisory duties over boys in his care, his conduct was shaped by a belief system that demanded blind loyalty under threat of eternal consequences. This dynamic of cult persuasion and obedience has been the subject of study for many years.[1] These studies demonstrate how a cult's coercive power diminishes one's capacity to understand their actions and conform to the law.[2] This is certainly true of the UNOI and its influence on Mr. Hadley, who was not spared or immune from the UNOI's coercive practices.

Upon his entry into the UNOI, Mr. Hadley was forced to surrender over $40,000 to Royall Jenkins – a sum that he had recently received from a life insurance settlement. During his first several years Mr. Hadley lived in a dormitory with many other young, single men. He was not allowed to communicate with those outside of the UNOI. He was not paid, nor was he allowed to access UNOI funds without asking for permission, which was not always granted. Mr. Hadley did not get to choose where he lived or whom he lived with. He nearly died of black mold exposure and was denied medical

---

1 *See* Leon Festinger — *When Prophecy Fails* (1956); Robert Jay Lifton — *Thought Reform and the Psychology of Totalism* (1961); Margaret Singer — *Cults in Our Midst* (1995); Janja Lalich — *Bounded Choice* (2004).
2 *See id; see also* Adedokun Taofeek, *The Psychology of Indoctrination: How Coercive Cults Exploit Vulnerability and Foster Radical Beliefs* (2024).

care. His lifestyle, diet, and dress were modest and consistent with a member status rather than that of the "Royall Family."  In short, the very practices that Mr. Hadley was convicted of are those that were used against him to gain his obedience.  Most important though, Mr. Hadley's conduct flowed from indoctrination rather than greed or malevolence, thus rendering his culpability far less than the typical forced labor conspirator. Hadley was acting under the functional equivalent of duress or diminished capacity, not in a clinical sense, but as someone who was socialized within a coercive, theocratic regime, where dissent was unthinkable, disobedience was spiritual suicide, and questioning Royall's authority was equated with rebellion against God.

18 U.S.C. § 3553(a) authorizes the Court to consider "the history and characteristics of the defendant" and "the nature and circumstances of the offense." As well, USSG §5K2.12 and §5K2.13 support departures in cases involving diminished capacity or coercion-like conditions, even where the strict criteria for formal duress are not met. Mr. Hadley was not a free actor operating in a vacuum. His behavior was shaped, channeled, and in many respects dictated by a cult that weaponized belief and fear to command obedience. While he must be held accountable, that accountability must be proportionate to his true moral agency — which was profoundly compromised by the psychological captivity in which he lived and acted. A downward

departure or variance is not only legally justifiable, but morally and factually

necessary to ensure a sentence that reflects individualized justice, not

abstract retribution. For these reasons, Mr. Hadley requests this court

sentence him to probation for a term of five years.

2. **Mr. Hadley's role in the UNOI was substantially less culpable than his codefendants.**

The government's case against Mr. Hadley centered on his

participation in the UNOI, a hierarchical religious organization with

thousands of members and hundreds of appointed leaders. However, Mr.

Hadley's role was limited in scope, time, and authority compared to others

convicted in this case.

Mr. Hadley held a local-level position (FOI Captain in Kansas City). He

was not a national officer, nor a member of the Royall Family, which held

true power in the UNOI. He operated largely in technical and educational

functions — managing the biodiesel lab, teaching, and supervising

recreational activities such as fishing and camping trips. He reported to

Majeed or Royall but did not create or direct organizational policy. Unlike

the core architects of the abuse, Hadley's conduct lacked the planning,

financial control, or ideological propagation that characterized the conduct of

Majeed, Rassoul, or Staton. He did not hold national authority, was not a

financial beneficiary, and was not a founding member. While he exercised

supervisory duties over boys in his care, his conduct was shaped by a belief system that demanded blind loyalty under threat of eternal consequences.

Mr. Hadley championed education and activities that were inconsistent with someone who was grooming children for labor. Unlike other co-conspirators, Mr. Hadley educated children in subjects that served no function in the life of a UNOI worker. These included upper-level mathematics courses, science courses, and literature courses. As well, Mr. Hadley led outdoor youth activities including camping, hiking, swimming, horseback riding, and fishing derbies. He even partnered with the Boy Scouts of America to obtain tents and canoes, and worked with city officials to train lifeguards and open pools for the benefit of youth in Kansas City. This record stands in sharp contrast to the profile of a child exploiter. Grooming behavior typically involves isolating children, depriving them of outside exposure, and suppressing their personal development. Mr. Hadley, by contrast, opened doors, built skills, and gave children normal, enriching experiences.

Unlike others involved in UNOI's leadership, there is no credible evidence that Mr. Hadley encouraged or participated in grooming relationships, sexual or otherwise. His name is not associated with any allegations of inappropriate personal relationships with minors. The PSIR details allegations of physical discipline, some of which are serious and

warrant accountability, but these are not remotely equivalent to grooming or trafficking as understood in legal or psychological terms.

Given the disparity in leadership, control, and intent, sentencing Hadley to the same term as high-level conspirators would create unwarranted sentencing disparity, contrary to 18 U.S.C. § 3553(a)(6). A sentence of probation would serve as an appropriate sentence.

3. **Mr. Hadley's History and Characteristics show rehabilitation and strong community ties.**

In addition to the mitigating circumstances surrounding Mr. Hadley's role and ideological conditioning, this Court should consider the extraordinary rehabilitation and sustained positive conduct he has exhibited since leaving the UNOI. A defendant's post-offense behavior is a critical indicator of character, recidivism risk, and appropriate punishment.

Under 18 U.S.C. § 3553(a)(1) and § 3553(a)(2)(D), sentencing must account for "the history and characteristics of the defendant" and ensure a sentence promotes rehabilitation — not merely punishment. Mr. Hadley's conduct since the offense period demonstrates that he has long since renounced the UNOI's ideology, embraced law-abiding values, and become a constructive force in his community.

The offense conduct ended in 2011, and since that time — for more than twelve consecutive years — Mr. Hadley has: 1) Maintained full-time

employment, including holding a supervisory role with the City of Atlanta

Department of Aviation, overseeing critical infrastructure and public service;

2) Resigned voluntarily from his high-ranking position once charged, in an

act of accountability and respect for the process; and 3) Remained on pretrial

release since 2021 with zero violations, demonstrating responsibility,

discipline, and transparency with the Court and Pretrial Services. This

prolonged period of law-abiding behavior cannot be dismissed as incidental —

it reflects a genuine repudiation of past mistakes and a sustained

commitment to legal and civic norms.

Unlike many defendants who recede from public life after indictment,

Mr. Hadley has continued to serve and uplift others. Mr. Hadley serves on

the Planning Commission for the City of South Fulton, contributing to local

governance and urban development. He is developing an equestrian therapy

program for children with special needs, using land and resources he owns to

help marginalized youth. He volunteers with the Boy Scouts of America,

reinforcing pro-social mentoring and leadership values. He operates and

supports local farmers markets that promote sustainability and community

access to fresh food. These are not performative acts. They reflect a man who

has become a pillar of his community, not a threat to it.

Mr. Hadley's proudest accomplishments are his children, ages 14, 15,

18, 21, and 22. The two oldest are attending Kennesaw State University with

one on a pre-med track and the other in the army national guard – reflecting his commitment to education, discipline, and service. The middle child is a freshman at Georgia State University and the two youngest still in high school. Mr. Hadley is actively involved in his daughters' lives and extracurricular activities. Although some have reached adulthood, he continues to support them all financially. Mr. Hadley currently resides with and cares for his terminally ill mother, a two-time cancer survivor with significant medical needs. She relies upon Mr. Hadley for day-to-day care and will suffer greatly if he becomes incarcerated. Mr. Hadley's incarceration would not only interrupt a rehabilitated life — it would directly harm those who rely on him for care, support, and guidance.

The lifestyle adopted by Mr. Hadley after 2011 is not of someone in denial or defiance. It reflects a person who, whatever his past affiliations, has long since reintegrated into society in a healthy and productive way. Mr. Hadley has renounced the conduct at issue; there has been a significant passage of time between the offense and sentencing; he has demonstrated clear and convincing rehabilitation; and incarceration would be detrimental to ongoing community or family responsibilities. Under these circumstances, other courts have found probation to be an appropriate sentence. *See*, e.g., *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009); *United States v. Prevatte,* 66 F.3d 840 (7th Cir. 1995); *United States v. Autery*, 555 F.3d 864

(9th Cir. 2009) (affirming a probationary sentence despite a calculated guideline range of 41–51 months, based in large part on the defendant's "commendable conduct following the offense.").

Mr. Hadley has shown, in words and deeds, that he is no longer the man shaped by the UNOI's ideology. He is not the sum of his past, but a father, a public servant, a community advocate, and a rehabilitated citizen. A downward variance based on extraordinary post-offense rehabilitation is warranted under § 3553(a), and a sentence of five years of probation would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

### 4. Request for Variance to Probation to Maximize Victim Restitution

The Court is tasked not only with punishing wrongdoers but also with making victims whole to the greatest extent possible. In this case, a downward variance to a sentence of probation would directly serve that core sentencing objective by enabling Mr. Hadley to maintain lawful employment and begin making meaningful restitution to the victims identified in the PSIR.

Under 18 U.S.C. § 3553(a)(7), the Court must consider "the need to provide restitution to any victims of the offense." In cases where a term of incarceration would undermine the defendant's ability to earn income and pay restitution, courts are justified in imposing non-custodial sentences that better serve the financial recovery of victims because incarceration would

eliminate Mr. Hadley's ability to pay.

Mr. Hadley is currently employable, educated, and skilled. He previously served in a leadership position with the Department of Aviation for the City of Atlanta. He has experience in engineering, alternative energy, logistics, and teaching. He has maintained steady employment for over a decade, including throughout the pretrial phase. If sentenced to incarceration, Mr. Hadley's ability to pay restitution would be completely severed: prison wages are minimal, yielding negligible restitution over a 5-year sentence. Post-incarceration reintegration would be significantly hampered by ex-inmate stigma, especially given his age and public nature of the offense. Any career, licensing, or public service opportunities would be substantially foreclosed, impairing long-term earning potential. By contrast, placing Mr. Hadley on supervised probation would allow the Court to require him to maintain gainful employment, set up a structured restitution schedule with monthly payments tied to actual income, and monitor his finances and enforce compliance through probationary oversight. This ensures that restitution is not symbolic, but real — money reaches victims, not just punitive metrics. Numerous courts have held that the goal of restitution can support a variance or even a non-Guidelines sentence. *See United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) (stating "the district court's goal of obtaining restitution for the victims of Defendant's offense, 18 U.S.C. §

3553(a)(7), is better served by a non-incarcerated and employed defendant."); *United States v. Peterson*, 363 F. Supp. 2d 1060 (E.D. Wis. 2005) (Court issued sentence of one day imprisonment and 5 years probation, in part, because the defendant would be able to continue making restitution payments.); *U.S. v. Allen*, No. 08-CR-154, 2008 WL 5101690, at 3 (E.D. Wis. Dec. 1, 2008) (granting a "short" three month custodial sentence so that the defendant could keep her job and pay restitution). These rulings confirm that restitution is not a peripheral concern — it is a central, statutory goal of sentencing that may, and often should, override purely punitive impulses when it serves victims directly, particularly when the defendant is ready and willing to pay, as Mr. Hadley is.

Mr. Hadley has a history of high-level employment and professional responsibility. Throughout his life, he has demonstrated financial literacy and maturity. He lives modestly (with his mother) and can prioritize restitution payments under supervision. He has expressed willingness to begin immediate payments and comply with a financial plan. The PSIR confirms that he is capable of earning and has no known substance abuse or dependency issues that would impair job performance. In contrast to many criminal defendants, Mr. Hadley is financially viable and poses no flight risk or resistance to restitution enforcement

Restitution to victims is a core tenet of sentencing under § 3553(a)(7). A

sentence of incarceration would completely foreclose the possibility of meaningful restitution by Mr. Hadley in this case. By contrast, a sentence of probation with a court-enforced restitution plan would ensure that those harmed by the offense begin to receive tangible compensation. Accordingly, Mr. Hadley respectfully requests that the Court impose a sentence of probation in order to maximize compliance with restitution and fulfill the remedial purposes of federal sentencing law.

### 5. Restitution Amount and Payment

The PSIR indicates a single request for restitution from KR in the amount of $481,317.20. That request is comprised of $453,517.20 for unpaid wages, $1800 for food stamps, and $26,000 for five years of therapy. Mr. Hadley objects to KR's request for restitution, or in the alternative, requests a substantial downward adjustment in any restitution award. While he does not deny the gravity of the offense or the harm caused to certain individuals within the UNOI structure, restitution must be individualized, causally-linked, and non-speculative financial loss. The restitution sought here does not meet those requirements as to Mr. Hadley's personal conduct.

Mr. Hadley's conviction was for conspiracy, not substantive forced labor counts. There is no evidence that Mr. Hadley personally caused specific victims to suffer financial loss, nor that any of the proposed restitution amounts were the direct result of his specific actions. Restitution based on

generalized harm caused by a larger criminal enterprise — especially where the defendant did not financially benefit, was not in leadership, and did not control labor assignments — exceeds the scope of MVRA. If restitution is ordered, it should be individually assessed and not ordered joint and severally.

Mr. Hadley was not a national leader of the UNOI. He was a local FOI Captain, with limited supervisory duties. He did not profit from forced labor, did not control UNOI finances, did not personally assign victims to labor without compensation, did not own or operate any of the businesses that generated income from labor, and did not go on to profit from the organization after he left. The government's proposed restitution seeks to hold Mr. Hadley jointly and severally liable for an amount that represents the totality of losses, while Mr. Hadley's role in and benefit from the conspiracy was minimal, which violates basic principles of individualized sentencing and due process.

The burden is on the government to prove the amount of loss by a preponderance of the evidence. The sum provided in the PSIR is an estimate generated by KR's lawyers. Mr. Hadley objects to any restitution that is based on estimates or undocumented wage calculations. The exhibits provided in the PSIR related to restitution include duplicative or speculative claims of reimbursement without a clear connection to Mr. Hadley. The PSIR and government have not provided individualized accounting of how much KR lost

due to Mr. Hadley's actions specifically, nor has it shown that he was the proximate cause of the total claimed restitution. In the absence of clear documentation, restitution must be denied or sharply limited.

Mr. Hadley respectfully requests that the Court reject any joint and several restitution award that is not tied to Mr. Hadley's own conduct; exclude victims and amounts not directly attributable to his specific acts or omissions; or in the alternative, cap restitution at a nominal or reduced figure that reflects his relative culpability, role, and earning potential; and Structure any restitution order to allow payment over time under probationary supervision, rather than incarceration that would eliminate his capacity to pay.

## CONCLUSION

Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing. In this case, a probationary sentence would promote respect for the law, reflect the seriousness of the offense, protect the public from further crimes of the defendant (who poses no risk); avoid unwarranted disparities between co-defendants, and permit the defendant to pay restitution. Mr. Hadley requests a variance and/or departure from the guideline sentence to a sentence of five years of probation with conditions.

Respectfully Submitted,

/s/ Michael C. Duma
Michael Duma #24959
Duma Law Offices
303 E. Poplar St.
Olathe, KS 66061
(913) 782-7072
Fax: (913) 782-1383
michael@dumalaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all other counsel of record.

/s/ Michael C. Duma
Michael Duma #24959